SPOMER, STATE'S ATTORNEY OF ALEXANDER
COUNTY, ILLINOIS *v.* LITTLETON ET AL.

No. 72–955.  Argued October 17, 1973—Decided January 15, 1974

WHITE, J., delivered the opinion for a unanimous Court.

*James B. Zagel* argued the cause for petitioner.  With him on the brief was *Patrick F. Healy.*

*Alan M. Wiseman* argued the cause for respond-

ents. With him on the brief were *James B. O'Shaugh-nessy* and *Michael P. Seng.**

MR. JUSTICE WHITE delivered the opinion of the Court.

This is a companion case to *O'Shea* v. *Littleton, ante,* p. 488, involving claims which the respondents, 17 black and two white residents of Cairo, Illinois, individually and as representatives of the class they purport to represent, set forth in that portion of their amended civil rights complaint which alleged wrongful conduct on the part of Peyton Berbling, individually and in his capacity as State's Attorney for Alexander County, Illinois, the county in which the city of Cairo is located. As discussed in *O'Shea,* the complaint alleged a broad range of racially discriminatory patterns and practices in the administration of the criminal justice system in Alexander County by the Police Commissioner of Cairo, Magistrate Michael O'Shea and Associate Judge Dorothy Spomer of the Alexander County Circuit Court, State's Attorney Berbling, and Earl Shepherd, an investigator for Berbling. Allegedly, a decade of active, but lawful, efforts to achieve racial equality for the black residents of Cairo had resulted in continuing intentional conduct on the part of those named as defendants in the complaint to deprive the plaintiff-respondents of the even-handed protection of the criminal laws, in violation of various amendments to the Constitution and 42 U. S. C. §§ 1981, 1982, 1983, and 1985.

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Edward A. Hinz, Jr.,* Chief Assistant Attorney General, *Doris H. Maier* and *Edward P. O'Brien,* Assistant Attorneys General, and *Robert R. Granucci,* Deputy Attorney General, for the State of California; and by *Joseph P. Busch* for the District Attorney of Los Angeles County.

516

In particular, the complaint charged State's Attorney Berbling with purposeful racial discrimination, under color of state law, by neglecting to provide for respondents' safety though knowing of the possibility of racial disorders, by refusing to prosecute persons who threaten respondents' safety and property, and by refusing to permit respondents to give evidence against white persons who threaten them. It was alleged, with particular incidents recounted as to some charges, that "Berbling has denied and continues to deny" the constitutional rights of respondents and members of their class by following the practices of (a) refusing to initiate criminal proceedings and to hear criminal charges against white persons upon complaint by members of respondents' class,[1]

---

[1] Specific examples of Berbling's practice were alleged as follows:

"(1) On March 28, 1969, defendant refused to permit James Wilson to file criminal charges against Charlie Sullivan, a white man, who pointed a gun at him as he (Wilson) attempted to move into the house next door to Charlie Sullivan on 22nd Street, in Cairo, Illinois. Sullivan threatened Wilson with the gun and told him to move the truck containing household furnishings and leave the area, thereby attempting to prevent James Wilson from holding property.

"(2) On or about March 29, 1969, defendant refused to permit James Wilson to file criminal charges against Charlie Sullivan who fired shots from a gun around James Wilson's home to intimidate his family in order to prevent James Wilson from holding property.

"(3) In January, 1970, defendant refused to permit Robert Martin to file charges against Charlie Sullivan, who tried to run him down in a truck while peacefully marching in exercise of his First Amendment rights.

"(4) In June, 1970, defendant refused to permit Ezell Littleton to file charges against a white man who without cause or justification assaulted and battered him.

"(5) In June, 1970, defendant refused to permit Rev. Manker Harris to file charges against two white policemen of the City of Cairo for attempted murder and/or malicious prosecution.

"(6) On August 10, 1970, defendant Berbling, through a subordinate, defendant Earl Shepherd, refused to permit plaintiff Hazel

(b) submitting misdemeanor complaints which have been filed by black persons against whites to a grand jury, rather than proceeding by information or complaint, and then either interrogating witnesses and complainants before the grand jury with purposeful intent to racially discriminate,[2] or failing to interrogate them at all,[3] (c) in-

---

James to file criminal charges against Raymond Hurst, a white man, who had kicked plaintiff James in the stomach while she was peacefully demonstrating against the racially discriminatory practices of merchants and of public officials of the City of Cairo.

"(7) In May, 1969, Plaintiff Ewing and eight others could have [brought] and desired to bring criminal charges against a white man who threatened them with a shotgun, but did not because they knew of defendant's practice of refusing to take complaints and were discouraged from making useless gestures."

[2] Cited in support of this allegation was an incident when "Morris Garrett (a 13 year old boy), on August 8, 1970, during a demonstration against the racially discriminatory practices of merchants and public officials of the City of Cairo, was struck by one Tom Madra. A complaint was filed which was presented to the grand jury. Morris Garrett appeared before the grand jury. Defendant Berbling, rather than question him regarding the incident, asked him such questions as 'did you get paid for picketing?' A no-true bill was returned by the grand jury."

[3] Two episodes of this type were described:

"(1) On August 13, 1970, Cheryl Garrett and Yvonda Taylor, ages 18 and 16 respectively, were shot at by one Jack Guetterman, Jr. Rev. Walter Garrett and Ezell Littleton, following a telephone call from the young girls, went to the scene of the shooting. Shortly thereafter police officers arrived. While Rev. Walter Garrett was discussing the situation with one police officer, one Jack Guetterman, Sr. struck Rev. Garrett in the face, causing him to fall to the ground. A complaint was filed by Rev. Walter Garrett respecting this incident. Defendant Berbling presented the complaint to the grand jury, but Rev. Garrett was not interrogated at all respecting the incident. Ezell Littleton, who witnessed the assault, was not called to testify.

"(2) On or about August 8, 1970, Curtis Johnson was struck by one Al Moss while demonstrating against the racially discrimina-

adequately prosecuting the few criminal proceedings instituted against whites at respondents' behest in order to lose the cases or settle them on terms more favorable than those brought against blacks, (d) recommending substantially greater bonds and sentences in cases involving respondents and members of their class than for cases involving whites, (e) charging respondents and members of their class with significantly more serious charges for conduct which would result in no charge or a minor charge against a white person, and (f) depriving respondents of their right to give evidence concerning the security of members of their class.[4]  Each of these practices was alleged to be willful, malicious, and carried out with intent to deprive respondents and members of their class of the benefits of the county criminal justice system and to deter them from peacefully boycotting or otherwise engaging in protected First Amendment activity.  Since there was asserted to be no adequate remedy at law, respondents requested that Berbling be enjoined from continuing these practices, that he be required to "submit a monthly report to [the District Court] concerning the nature, status and disposition of any complaint brought to him by plaintiffs or members of their class, or by white persons against plaintiffs or members of their class," and that the District Court maintain continuing jurisdiction in this action.[5]

---

tory practices of merchants and public officials of the City of Cairo. A complaint was filed, which was presented to the grand jury. Curtis Johnson, however, was not interrogated by defendant Berbling respecting the incident."

[4] Thus, respondents alleged that Berbling sought the "dropping of a criminal charge arising out of a complaint filed by Frank Hollis, a black person, against Tom Madra, a white person, in return for which [Berbling] would drop pending criminal charges against several of the [respondents]."

[5] Damages were also sought against Berbling for these practices and for an alleged conspiracy with his investigator, Shepherd, to

The District Court dismissed that portion of the complaint requesting injunctive relief against Berbling, as well as against Investigator Shepherd, Magistrate O'Shea, and Judge Dorothy Spomer, for want of jurisdiction to grant any such remedy, which was perceived as directed against discretionary acts on the part of these elected state officials. The Court of Appeals reversed, holding that whatever quasi-judicial immunity from injunctive proscription it had previously recognized was appropriate for a prosecutor, was not absolute, and since respondents' alternative remedies at law were thought to be inadequate, an injunctive remedy might be available if respondents could prove their claims of racial discrimination at trial.[6]

The Court of Appeals rendered its decision on October 6, 1972. At the subsequent election in November

refuse to prosecute those who threatened respondents' safety and to prevent them from giving evidence against whites concerning acts threatening their personal safety. As to the latter, the sixth example in n. 1, *supra,* was reiterated. The Court of Appeals held that "insofar as defendant Berbling was acting within his prosecutorial function he has a quasi-judicial immunity from suit for damages under the Civil Rights Acts," 468 F. 2d 389, 410, and remanded to allow respondents to amend the complaint and to have the District Court determine in the first instance whether some of the acts then alleged would be sufficiently removed from quasi-judicial activity "to warrant removing the cloak of immunity from them." *Id.,* at 410–411. Berbling's petition for certiorari questioning this aspect of the Court of Appeals' ruling was not timely filed in this Court and has been denied. No. 72–1107, *post,* p. 1143. No question concerning damage relief is involved in the case presently before us.

[6] The scope of any injunction which might be found warranted was not finally established or restricted. It was suggested that an initial decree might require "only periodic reports of various types of aggregate data on actions on bail and sentencing and dispositions of complaints," and confidence was expressed that the District Court would be able to establish further guides as required and, if necessary, to consider individual decisions. 468 F. 2d, at 415.

of that year, petitioner W. C. Spomer [7] was chosen by the voters to succeed Berbling as State's Attorney for Alexander County, and Spomer took office on December 4. In the petition for certiorari filed with this Court on January 3, 1973, seeking review of the Court of Appeals' approval of the possibility of some form of injunctive relief addressed to the State's Attorney in the course of his prosecutorial role, petitioner Spomer relied upon Supreme Court Rule 48 (3), which provides that "[w]hen a public officer is a party to a proceeding here in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party." Respondents did not oppose the substitution,[8] and we granted certiorari and set the case for argument together with *O'Shea* v. *Littleton, ante,* p. 488. 411 U. S. 915 (1973).

It has become apparent, however, that there is nothing in the record upon which we may firmly base a conclusion that a concrete controversy between W. C. Spomer and the respondents is presented to this Court for resolution. No allegations in the complaint cited any conduct of W. C. Spomer as the basis for equitable or any other relief. Indeed, Spomer is not named as a

---

[7] State's Attorney W. C. Spomer should not be confused with Judge Dorothy Spomer, a petitioner in *O'Shea* v. *Littleton, ante,* p. 488.

[8] In their brief in opposition to the petition, p. 6, respondents stated that they "seek only equitable relief against petitioner W. C. Spomer. Because the amended complaint asks relief against Berbling in his individual as well as his official capacity, he remains a party in interest in this action." Of course, Spomer, not Berbling, filed for review of the Court of Appeals' decision respecting injunctive relief, and Berbling is not before the Court in this case. Nor did respondents ever seek relief of any kind against Spomer by their complaint.

defendant in the complaint at all, and, of course, he never appeared before either the District Court or the Court of Appeals. The injunctive relief requested against former State's Attorney Berbling, moreover, is based upon an alleged practice of willful and malicious racial discrimination evidenced by enumerated instances in which Berbling favored white persons and disfavored Negroes. The wrongful conduct charged in the complaint is personal to Berbling, despite the fact that he was also sued in his then capacity as State's Attorney.[9] No charge is made in the complaint that the policy of the office of State's Attorney is to follow the intentional practices alleged, apart from the allegation that Berbling, as the incumbent at the time, was then continuing the practices he had previously followed. Cf. *Allen* v. *Regents of the University System of Georgia,* 304 U. S. 439, 444–445 (1938). Nor have respondents ever attempted to substitute Spomer for Berbling after the Court of Appeals decision, so far as the record shows, or made any record allegations that Spomer intends to continue the asserted practices of Berbling of

---

[9] This Court's Rule 48 (3), governing automatic substitution of successor public officers when the predecessor was a party "in his official capacity," is based upon Fed. Rule Civ. Proc. 25 (d), as amended in 1961. Prior to the 1961 amendment, substitution was not automatic. The history and application of former and present Rule 25 (d) are sketched in 3B J. Moore, Federal Practice ¶ 25.09 [1]– [3] (2d ed. 1969). Of particular relevance is the Advisory Committee Note on the 1961 "automatic substitution" amendment to Rule 25 (d), which suggests that "[i]n general it will apply whenever effective relief would call for corrective behavior by the one then having official status and power, rather than one who has lost that status and power through ceasing to hold office." See *id.,* ¶ 25.09 [3], at 25–403, 25–404. The question of whether corrective behavior is thought to be necessary is, of course, dependent on whether the dispute with the predecessor continues with the successor.

which they complain. The plain fact is that, on the record before us, respondents have never charged Spomer with anything and do not presently seek to enjoin him from doing anything.[10] Under these circumstances, recognizing that there may no longer be a controversy between respondents and any Alexander County State's Attorney concerning injunctive relief to be applied *in futuro,* see *Two Guys* v. *McGinley,* 366 U. S. 582, 588 (1961), we remand to the Court of Appeals for a determination, in the first instance, of whether the former dispute regarding the availability of injunctive relief against the State's Attorney is now moot and whether respondents will want to, and should be permitted to, amend their complaint to include claims for relief

---

[10] Despite the statement respondents made in their brief in opposition to the petition for certiorari, n. 8, *supra,* the record does not contain any indication that respondents have ever sought injunctive relief against Spomer in any proceedings in the District Court or the Court of Appeals. Nor would they have had reason to do so in the absence of knowledge that he would succeed Berbling. While Spomer did substitute himself in place of his predecessor, and his counsel made the somewhat extraordinary statement at oral argument that "there is nothing in this record, nor will there be on the part of my client, to indicate that he would change the policies which are alleged to have been exercised by his predecessor," Tr. of Oral Arg. 7, to determine whether respondents have a live controversy with Spomer, we must look to the charges *they* press. Indeed, counsel for respondents observed at oral argument of this case that "in order for us to proceed against Mr. Spomer, it would be necessary for us to investigate the facts to see that the concession apparently made by the State's Attorney is true and amend our complaint." *Id.,* at 19. This merely serves to underscore our concern that we are being asked to render an opinion on the merits of what is now and may continue to be a hypothetical or abstract dispute. See *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240–241 (1937); *United States* v. *Fruehauf,* 365 U. S. 146, 157 (1961); *North Carolina* v. *Rice,* 404 U. S. 244, 245–246 (1971).

against the petitioner. Cf. *Land* v. *Dollar,* 330 U. S. 731, 739 (1947).

The judgment of the Court of Appeals is vacated and the case is remanded for further consideration and proceedings consistent with this opinion.

*It is so ordered.*