The judgment of the district court will be affirmed.

**Robert BEGINS and Patricia Begins, Plaintiffs-Appellants,**

v.

**Paul PHILBROOK, Commissioner of the Vermont Department of Social Welfare, Defendant-Appellee.**

**No. 482, Docket 74–2140.**

United States Court of Appeals, Second Circuit.

Argued Feb. 14, 1975.

Decided March 25, 1975.

---

whether United States v. Rickus, 351 F.Supp. 1386 (E.D.Pa.1972), aff'd mem., 480 F.2d 919 (3rd Cir.), cert. denied, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973), was correctly decided. Compare Paige v. United States, 493 F.2d 22 (9th Cir.), cert. denied, 417 U.S. 935, 94 S.Ct. 2649, 41 L.Ed.2d 238 (1974) and United States v. Greene, 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973); with United States v. De Alba-Comrado, 481 F.2d 1266 (5th Cir. 1973).

**6.** Defendant has not contended that the array in this case was chosen other than in accordance with the jury selection plan of the District Court of the Virgin Islands, adopted and approved pursuant to 28 U.S.C. § 1863. Under that plan a jury wheel of a minimum of 1,000 names is chosen at random from the voter register of St. Croix and from that wheel jury arrays are chosen at random as needed. 5 V.I.C. App. V, Rules 65–67 (Supp.1973).

Before HAYS and FEINBERG, Circuit Judges, and HOLDEN, District Judge.[*]

FEINBERG, Circuit Judge:

Robert and Patricia Begins appeal from an order of the United States District Court for the District of Vermont, Albert W. Coffrin, J., dismissing as moot their complaint against Paul Philbrook, Commissioner of the Vermont Department of Social Welfare. Plaintiffs attack a Vermont regulation that makes ineligible for welfare benefits any family owning two operable motor vehicles, without regard to the value of the automobiles. The suit was brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202, and jurisdiction is based on 28 U.S.C. §§ 1343(3), (4). Plaintiffs allege that the "two-car" Regulation violates their federal constitutional rights and the federal laws and regulations governing the Vermont Aid to Needy Families with Children (AFNC) program.[1] Because we believe that the district court erred in dismissing the complaint, we reverse and remand for further proceedings.

For the purposes of this appeal, we must take as true factual allegations made in the district court. According to the papers before us, Robert and Patricia Begins live in South Burlington, Vermont, with their five children, ranging in age from four to twelve. Robert Begins is a construction worker whose employment is seasonal. He uses a car to commute to and from work in all parts of northern Vermont. Patricia Begins normally uses a car for ordinary domestic chores and for transporting her large

Zander B. Rubin, St. Johnsbury, Vt. (Vermont Legal Aid, Inc., on the brief), for plaintiffs-appellants.

Dean B. Pineles, Asst. Atty. Gen., Montpelier, Vt., for defendant-appellee.

---

[*] Of the United States District Court for the District of Vermont, sitting by designation.

1. Plaintiffs' argument is based on the proposition that the Social Security Act and regulations implementing it contemplate that decisions made by a state on whether an applicant for welfare benefits is entitled to assistance will be rationally related to the need of the applicant. The two-car Regulation, however, results in an eligibility determination without regard to the value of the vehicles owned by the applicant. Thus, a family might own one Cadillac worth $10,000 and still receive benefits, but if it owns two virtually worthless automobiles, as plaintiffs claim they did, it will be denied benefits. Plaintiffs urge that because the Regulation is not rationally based on need, it denies them due process and equal protection of the law. Furthermore, since the state Regulation establishes a condition of eligibility unrelated to need, it conflicts with federal law and regulations and is void under the Supremacy Clause of the Constitution. We express no view on the merits of these claims.

family. Plaintiffs' youngest child has serious coronary and respiratory problems and often needs immediate medical attention, making it necessary to have an automobile available.

In late November 1973, plaintiffs applied for assistance from the Vermont Department of Social Welfare in the category of AFNC-unemployed father. At that time, plaintiffs were denied aid because of the two-car Regulation, which is reproduced in the margin.[2] Plaintiffs then owned two cars—a 1966 Mercury purchased four years before for $695, and a 1962 Jeep bought five years earlier for $1,500. Both cars had seriously deteriorated and had little resale value. In late January, plaintiffs again applied for benefits and were granted assistance on condition that they make a bona fide effort to sell one of the cars. Under the two-car Regulation, "assistance may be granted provisionally, for a period not to exceed 60 days," but if the "sale is not completed within 60 days, assistance shall be terminated." See note 2 supra.

In February 1974, plaintiffs filed this action challenging the Regulation, along with an application for a temporary restraining order. This application was apparently not acted upon. The complaint originally sought the convening of a three-judge court and both injunctive and declaratory relief. According to an amended complaint filed in May 1974: While plaintiffs were still receiving "provisional" benefits, they were told by an employee of the Vermont Department of Social Welfare that if they did not transfer ownership of one of their cars their welfare payments would end immediately. Rather than risk this, plaintiffs sold their 1962 Jeep for $250, without speaking to counsel. However, plaintiffs still "need and want two cars" because Mr. Begins "needs a car to look for work, and in his work as a construction laborer, and Mrs. Begins needs a car for do-

**2.** Section 2263.4 of the Vermont Welfare Assistance Manual, according to the text supplied by defendant, provides as follows:

*Automobiles*

An automobile is defined as any passenger car, truck or jeep, registered or unregistered that is in intact condition, stored, or on blocks. An intact vehicle includes all major operating parts, such as engine, transmission, wheels, steering mechanism, etc.

A non-operable automobile minus operating parts is considered junk and thus does not come within the definition of automobile; however, the salvage value of a junked automobile may represent a substantial resource requiring individual evaluation.

*One automobile per assistance group, regardless of its value, shall be excluded from consideration within the limitation on combined resources. Ownership of more than one automobile by members of an assistance group shall disqualify the group* except as follows:

1. Additional automobile(s) which qualify as "income producing property" shall be considered under the provisions applicable to such property (see Income Producing Property).

2. Additional automobile(s) which would qualify as "income producing property," except that the assistance group member is not presently operating the vehicle because he is incapacitated or disabled, shall be considered under the provisions applicable to such property, provided that:

a. The grant of public assistance is based on the incapacity or disability of the assistance group member making use of the vehicle; and

b. The vehicle was used to produce income immediately preceding the onset of incapacity or disability; and

c. The individual will more probably than not require the vehicle to produce income at the end of the period of incapacity or disability; and

d. The duration of incapacity or disability is not expected to exceed one year.

When an applicant indicates willingness to sell additional vehicles which would otherwise disqualify an assistance group, and all other eligibility conditions are met, assistance may be granted provisionally, for a period not to exceed 60 days, pending disposition of such additional automobiles. If sale is not completed within 60 days, assistance shall be terminated. (See also Application Decisions—Money Grant.)

When assistance has been granted under the provisions for considering an additional "income producing" vehicle during incapacity of its operator, actual use to produce income shall be resumed at the end of 12 months. If, at the end of 12 months, it is not possible to use such vehicle(s) to produce income, the vehicle(s) must be sold within 60 days, in order to qualify for continued assistance. [Emphasis added.]

mestic affairs." [3]  Apparently because of the sale of one car, plaintiffs dropped their request for injunctive relief and seek a declaratory judgment only.

In June 1974, defendant moved to dismiss the amended complaint on the ground that the action was moot because plaintiffs no longer owned two cars. Shortly thereafter, plaintiffs moved to amend their complaint again to include a claim for damages for denial of assistance in November 1973.[4]  Defendant's motion to dismiss for mootness was heard in July, and granted a few days later in a one-page order which cited Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), and North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971), as authority. This appeal followed.

## II

By citing the two Supreme Court cases just referred to, the district judge obviously had in mind not just mootness but also the requisites for a declaratory judgment action, since Golden v. Zwickler is concerned primarily with the latter.  The two concepts blend together here in a way that suggests the difficulty of analyzing them separately.  Thus, even without a post-complaint change in position by plaintiffs here, that is, even if plaintiffs had never owned two cars, the question would still remain whether the complaint stated an "actual controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201.  But the fact that plaintiffs did only recently own two cars adds substance to the allegation that they "need and want two cars."  Keeping in mind, then, that more is involved here than whether plaintiffs' claims have been extinguished by events after they sued, we turn to the decisions relied upon by the district court and some of

those referred to by the parties in their excellent briefs.

In North Carolina v. Rice, the issue was whether a more drastic sentence imposed upon Rice after a second trial violated federal due process under North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).  At the time the case came before the Supreme Court the later sentence had already been served.  Although neither party urged that the case was moot, the Court raised the issue.  Pointing out that "[n]ullification of a conviction may have important benefits for a defendant  .   .   ., but urging in a habeas corpus proceeding the correction of a sentence already served is another matter," the Court remanded for reconsideration of mootness since the record was "unilluminating as to whether there may be benefits to respondent" under state law in having the sentence reduced after it had been served.  404 U.S. at 248, 92 S.Ct. at 405.

Golden v. Zwickler involved a challenge to a New York law prohibiting distribution of anonymous literature in an election campaign.  Plaintiff Zwickler had been convicted in a state court of violating that statute in connection with a 1964 congressional campaign.  The conviction was later reversed on state law grounds.  Plaintiff then sued in the federal district court for declaratory and injunctive relief, alleging that he wanted to distribute handbills against the same Congressman in 1966.  After intermediate proceedings not here relevant,[5] a three-judge court declared the statute unconstitutional.  290 F.Supp. 244 (E.D. N.Y.1968).  The Supreme Court reversed because Zwickler had not established "the existence  .   .   .  of the elements governing the issuance of a declaratory judgment."  394 U.S. at 110, 89 S.Ct. at 960.  Quoting from its decision in Mary-

---

3.  Amended complaint, par. 9d.

4.  It is not clear whether this motion was granted.  In any event, plaintiffs concede that under Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), this claim for retroactive welfare benefits after an improper denial of assistance would be barred by

the eleventh amendment unless consented to by the state.  Accordingly, they do not press the issue on appeal.

5.  Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), rev'g 261 F.Supp. 985 (E.D.N.Y.1966).

land Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), the Court emphasized that:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

394 U.S. at 108, 89 S.Ct. at 959. The Court then pointed out that the particular Congressman whom Zwickler had attacked in his handbill had become a New York State Supreme Court justice and that "it was most unlikely" that he "would again be a candidate for Congress." 394 U.S. at 109, 89 S.Ct. at 960. This precluded a finding of a controversy of "sufficient immediacy and reality" to justify declaratory relief against the New York statute.

Neither North Carolina v. Rice nor Golden v. Zwickler justified dismissal of the complaint in this case. The former raised the question whether there were harmful "collateral consequences of an already completed course of action"; [6] Rice had served his sentence and there was real doubt that a favorable judgment would have any practical benefit for him at all. In the latter case, the bite of the New York statute for Zwickler was no longer real and immediate since the only candidate against whom he wished to circulate handbills was not going to run for Congress. Cf. Spomer v. Littleton, 414 U.S. 514, 94 S.Ct. 685,

38 L.Ed.2d 694 (1974). Plaintiffs' position stands in sharp contrast. For practical purposes, defendant's course of action has not already ended; the Regulation still stands and defendant clearly intends to enforce it against plaintiffs should the occasion demand. If plaintiffs were not now on welfare, if they had never owned a second car, if they did not swear to a need for a second car, or if there were a believable possibility that they would not be threatened with loss of benefits if they again purchased a second car, the case might be different. But plaintiffs are now subject to the very prohibition which they seek to challenge, and their allegations suggest not some subjective fear, but rather assert both "present objective harm" and the "threat of specific future harm." Lecci v. Cahn, 493 F.2d 826, 829 (2d Cir. 1974). The continuing harm to plaintiffs is their loss of a second car they allegedly need; the threat, of course, is the loss of welfare benefits should they yield to their need and acquire another car. In *Lecci*, relied on by defendant, we held moot a challenge to a New York criminal statute prohibiting political activities by policemen. The plaintiff in that case, however, had left the police force and expressed no desire to return to it. Defendant also cites Kerrigan v. Boucher, 450 F.2d 487 (2d Cir. 1971), where a Connecticut boarding house lien law was under attack. But in holding the complaint properly dismissed there, we pointed out that the boarder had left his room and there was "no indication at all that he had failed to pay his rent to his new landlord or that detention of his personal effects is even remotely threatened." [7] 450 F.2d at 489. Here, the relationship between the parties and the present harm to plaintiffs have continued, and the threat of loss of benefits is real, not remote.

Defendant also relies heavily on United Public Workers of America v. Mitch-

---

6. See Note, The Mootness Doctrine in the Supreme Court, 88 Harv.L.Rev. 373, 380 (1974).

7. Sanders v. Wyman, 464 F.2d 488 (2d Cir. 1972), cert. denied, 409 U.S. 1128, 93 S.Ct. 950, 35 L.Ed.2d 261 (1973), is even more readily

distinguishable. Not only were plaintiffs in that case no longer in a position to complain of alleged illegal governmental action, but defendants had entered into stipulations apparently agreeing to the objectives of the suit.

ell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), cited by us in *Lecci,* supra. In *United Public Workers,* the Court ruled that it lacked the power to issue a declaratory judgment striking down the Hatch Act as to all but one of the plaintiffs, who alleged merely that they wished "to engage in 'political management and political campaigns,' to persuade others to follow [their] views" by all lawful means. The Court held that "[s]uch generality of objection is really an attack on the political expediency of the Hatch Act, not the presentation of legal issues," and would call for the rendering of an impermissible advisory opinion. 330 U.S. at 89, 67 S.Ct. at 564. The Court reached the merits and upheld the Act, however, as to one of the plaintiffs who was immediately threatened with loss of his job for specified political activity he had engaged in. We believe that plaintiffs' situation is much closer to the latter than the former state of facts.

We also think that the recent decision in Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), is instructive. There, employers whose plants had been struck challenged New Jersey's policy of providing unemployment benefits to strikers as an improper interference with the free collective bargaining structure established by the federal labor laws, since it would theoretically encourage strikes. The respondent union maintained that the suit for declaratory relief was mooted by the end of the strike. The Supreme Court disagreed, noting that the availability of welfare benefits for strikers "is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may

well be a substantial adverse effect on the interests of the [employers]." 416 U.S. at 122, 94 S.Ct. at 1698. Along the continuum of fact situations from the purely speculative to the ripe and real, this case—like *Super Tire*—is much closer to the latter. The Regulation's presence threatens direct and immediate injury to plaintiffs' economic position. See 416 U.S. at 125, 94 S.Ct. 1694.

Defendant argues that Mr. and Mrs. Begins may decide to abide by the Regulation and not buy another car.[8] But on this record, which demonstrates plaintiffs' special need for transportation, denying them access to the courts until they make such a purchase is an unduly restrictive interpretation of the Declaratory Judgment Act. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 153, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Moreover, even if plaintiffs did buy another car, they would have to sell it within the "provisional" 60 days or lose AFNC benefits which, by hypothesis, are badly needed.[9] There is clearly no guarantee that the underlying issues, which are of public significance, could be fully and finally decided by the courts in that short time. Without regard to the merits, then, the issue would be " 'capable of repetition, yet evading review' " in the pattern of *Super Tire,* supra, 416 U.S. at 125, 94 S.Ct. at 1700.

Plaintiffs have alleged facts which show that the challenged Regulation is adverse to their present interest and that the controversy is of "sufficient immediacy and reality" to warrant a declaratory judgment. They should not be required to go beyond that.

Judgment reversed and case remanded for further proceedings.

8. Brief for Appellee, at 18–19.

9. Defendant appears to concede that if plaintiffs did buy a replacement vehicle there would

be a justiciable issue, at least during the 60-day period. Brief for Appellee, at 11.