Martha G. DRAKE, Rodney A. Bailey, Robert A. Asperger, John R. Newhouse, Betty L. Newhouse, Stephen D. Webster, Anabelle C. Smith and Helen M. Le-Tarte, Plaintiffs,

v.

The DETROIT EDISON COMPANY, Northern Michigan Electric Cooperative, Inc., Wolverine Electric Cooperative, Inc., and the United States Nuclear Regulatory Commission, et al., Defendants.

No. G77–364 C.A.

United States District Court,
W. D. Michigan, S. D.

Jan. 19, 1978.

Martha G. Drake in pro. per.

Warner, Norcross & Judd, Grand Rapids, Mich., John D. Tully, Grand Rapids, Mich., of counsel, for defendants Det. Ed., N. Mich. Elec., Wol. Elec. & Nat. Rural Util. Coop.

James S. Brady, U. S. Atty., Grand Rapids, Mich., Stephen S. Ostrach, Washington, D.C., for U. S. Nuclear Reg. Comm.

## OPINION

FOX, Chief Judge.

Plaintiffs, eight individuals acting on their own behalf, brought this action to enjoin the sale of a 20 percent ownership interest in a nuclear power plant being constructed by the Detroit Edison Company to two electrical cooperatives of which they are members. It was alleged that the sale violated various sections of the Atomic Energy Act, 42 U.S.C. §§ 2011, *et seq.*, and the regulations promulgated thereunder.

In 1969 Detroit Edison ("Edison") filed with the United States Nuclear Regulatory Commission (NRC) an application for licensee as sole owner to construct and operate the Fermi 2 nuclear power plant. Following a review and public hearing the NRC issued a construction permit to Edison in 1972. Under the terms of the relevant statutory authority, the construction permit will be altered to an operating license when the facility is completed.

In February 1977 Edison entered into a Participation Agreement with Northern Michigan Electric Cooperative and Wolverine Electric Cooperative whereby Edison transferred a 20 percent ownership interest in the Fermi 2 plant to Northern and Wolverine. The Agreement provides that Edison will refund all payments made by the co-ops should required NRC approval of the sale not be obtained. In that event, it is also provided that the 20 percent interest will revert to Edison. Under the terms of the contract, Edison is to remain responsible for the engineering, design, construction, operation, and maintenance of the plant. An initial payment of $87.4 million was made, with subsequent payments so far totaling several million dollars more. The Participation Agreement requires the co-ops to pay for 20 percent of the total cost of construction of the plant. The co-ops have received loans and/or loan guarantees for the purchase from the National Rural Utilities Cooperative Finance Corporation and the Rural Electrification Administration.

In May 1977, Edison filed amendments to its construction permit reflecting the Participation Agreement. These amendments are currently pending before the NRC.

Plaintiffs contend that the sale amounts to an acquisition of a nuclear facility by the co-ops[1] without a license and an amendment to Edison's construction permit prior to NRC approval, in violation of §§ 101 and 184 of the Atomic Energy Act, as amended, 42 U.S.C. §§ 2131, 2234, and regulations 2.101, 50.10, 50.80, 50.90, and 50.91, 10 CFR §§ 2.101, 50.10, 50.80, 50.90, 50.91, promulgated thereunder. The two sections that appear most relevant are sections 50.10 and 50.90. Section 50.10 reads in relevant part as follows:

§ 50.10   License required.

(a) Except as provided in § 50.11, no person within the United States shall transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, use, import, or export any production or utilization facility except as authorized by a license issued by the Commission.

This language is virtually identical to that of section 101 of the Act, 42 U.S.C. § 2131. Section 50.90 of the regulations provides that "[w]henever a holder of a license or construction permit desires to amend the license or permit, application for an amendment shall be filed with the Commission, fully describing the changes desired, and following as far as applicable the form prescribed for original applications." Such an amendment must be filed to receive NRC approval of any alterations or transfers of a previously-issued construction permit or license or an existing nuclear facility. Approval is required before any amendments can be effective.

Defendants moved to dismiss plaintiffs' Complaint on two grounds. First, it was contended that plaintiffs failed to include in

---

1. The National Rural Utilities Cooperative Finance Corporation (CFC) is included as a defendant for the reason that plaintiffs allege that the CFC is also an unlicensed owner because the co-ops' interest in Fermi 2 is included in a mortgage it holds securing its loan to the co-ops.

their Complaint "a short and plain statement of the grounds upon which the Court's jurisdiction depends," as required by Rule 8 of the Federal Rules of Civil Procedure. Second, defendants contended that this court was an improper forum for consideration of plaintiffs' claims since an amendment has been filed with the NRC by Edison to reflect the Participation Agreement, the NRC is now considering the amendment, and plaintiffs have therefore failed to exhaust their administrative remedies. Moreover, defendants say, judicial review can occur only after a final order of an agency, and the hearing must then take place in the Court of Appeals.

■ With respect to the first ground of defense, it is recognized that failure to comply with the jurisdictional requirement of Rule 8 "will result in dismissal of the complaint on defendants' motion, *unless* the defect can be corrected by an amendment as of right or by leave of the court." Wright & Miller, *Federal Practice and Procedure: Civil* § 1214, at 106 (emphasis added). Indeed, it has been held that the absence of a complete allegation of jurisdiction does not even require amendment when the court can readily recognize the existence of a federal question and the requisite amount in controversy. *Littleton v. Berbling*, 468 F.2d 389, 394 (7th Cir. 1972), *vacated and remanded on other grounds sub nom. Spomer v. Littleton*, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974); *Fawvor v. Texaco, Inc.*, 387 F.Supp. 626, 628 (E.D. Tex.1975). These conditions are met here. It is very evident from plaintiffs' Complaint that the action arises under a federal statute and accompanying regulations. It is well established also that that statute, the Atomic Energy Act, was passed pursuant to Congress' power to regulate commerce, *see* 1964 *U.S.Code Cong. & Admin.News*, p. 3111, thus making 28 U.S.C. § 1337 the applicable jurisdictional provision. Section 1337 states that "[t]he district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ." Since section 1337 has no jurisdictional amount provision, and the action presents a

federal question, no amendment is necessary.

■ Defendants pressed the second ground for dismissal much more strongly. Their argument is not persuasive, however. Plaintiffs are not attempting to question an order of the NRC, prematurely or otherwise. As noted above, their allegations are concerned with violations of sections of the Act requiring a license to deal with nuclear facilities or the filing of an amendment for NRC approval of any alterations or transfers of a previously-issued construction permit or license. It is plaintiffs' contention that a sale of the 20 percent ownership interest in Fermi 2 occurred in February 1977, that an amendment was not filed until May 1977, and that approval has not yet been received from the NRC. Accordingly, the sale was accomplished without NRC approval, Edison is in possession of over $90 million of the sale price, and the statutory licensing requirements have been rendered meaningless. While plaintiffs might oppose NRC approval of the sale, and can express their opposition to the amendment of Edison's permit within the framework of an agency licensing hearing, they seek a remedy in this court for an event which has already transpired and which would be open to challenge even after NRC action in the licensing proceeding.

Defendants have cited a number of cases in their briefs in support of their argument that plaintiffs can intervene in the NRC hearings to oppose the amendment to Edison's permit. These cases are inapposite for purposes of this action, however. Plaintiffs have brought this action not to circumvent the administrative hearings on the issue of amending the existing permit, but rather to challenge what they allege to be a violation of the Act itself. Such challenges are not intended to be made in the context of a licensing hearing. Section 50.40 of the regulations, 10 CFR § 50.40, sets forth the types of standards to be applied by the NRC in licensing proceedings:

In determining that a license will be issued to an applicant, the Commission will

be guided by the following considerations:

(a) The processes to be performed, the operating procedures, the facility and equipment, the use of the facility, and other technical specifications, or the proposals in regard to any of the foregoing collectively provide reasonable assurance that the applicant will comply with the regulations in this chapter, including the regulations in Part 20, and that the health and safety of the public will not be endangered.

(b) The applicant is technically and financially qualified to engage in the proposed activities in accordance with the regulations in this chapter.

(c) The issuance of a license to the applicant will not, in the opinion of the Commission, be inimical to the common defense and security or to the health and safety of the public.

(d) Any applicable requirements of Part 51 have been satisfied.

(Part 51, referred to in subsection (d), deals with environmental considerations.)

■ It is apparent that the purpose of the license requirement is to provide adequate examination by the NRC of such factors as safety features, design requirements, and competent supervision and operation of nuclear facilities. Furthermore, Regulation 50.91, 10 CFR § 50.91, expressly states that in determining whether an amendment to a license will be issued the NRC must be guided by the same considerations which govern the issuance of initial licenses to the extent applicable. In the present context, it is obvious that plaintiffs' charges of violations of the Act will be deemed extraneous by the NRC in a license amendment proceeding. No findings or conclusions with respect to such charges are appropriate in that forum, and plaintiffs' interests will not be adequately considered there.

■ It is necessary to consider one more extremely important point: does a private cause of action exist under the Atomic Energy Act? For the reasons discussed below, I conclude that a private cause of action does exist.

There is no express private cause of action under the Atomic Energy Act. Sections 222 and 223, 42 U.S.C. §§ 2272, 2273, establish criminal penalties for any willful violations of the Act, and section 232, 42 U.S.C. § 2280, provides for injunction proceedings initiated by the United States Attorney General "[w]henever in the judgment of the Commission any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this chapter, or any regulation or order issued thereunder . . . ." In 1969 Congress added section 234 to the Act, which authorizes the NRC to levy civil monetary penalties on persons who violate the licensing provisions of the Act or any rule, regulations, order, or license issued thereunder. Since the Act thus nowhere purports to confer upon private individuals a right of action to enjoin the practices prohibited by the Act or to obtain damages following the commission of such acts, it is necessary to determine whether a private federal remedy can be implied.

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court dealt with the problem of granting private causes of action by implication. Justice Brennan, speaking for a unanimous Court, stated:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . ., that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a

cause of action based solely on federal law?"

*Id.* at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36 (citations omitted).

The Supreme Court has permitted an implied private cause of action under the Securities Act of 1933,[2] the Securities Exchange Act of 1934,[3] the Voting Rights Act of 1965,[4] the Railway Labor Act,[5] and the Fourth Amendment,[6] but has denied private remedies under the Federal Election Campaign Act,[7] the Amtrak Act,[8] the Securities Investor Protection Act,[9] and the Federal Safety Appliance Act.[10] These decisions are generally reconcilable using the factors discussed by the Court in *Ash, supra.* It is my view that the Atomic Energy Act falls within that type of legislation requiring implication of a private cause of action, and that this case closely parallels those Supreme Court precedents permitting such a remedy, while those denying that remedy are distinguishable.

(1) There is no doubt that plaintiffs here are within the class for whose especial benefit the statute was enacted. Section 2 of the Act expressly states that the employment of nuclear material must be regulated so that the health and safety of the public will be protected. 42 U.S.C. §§ 2012(d), (e), (i). Similarly, section 3 provides that:

It is the purpose of this chapter to effectuate the policies set forth above by providing for

. . . . .

(d) a program to encourage wide-spread participation on the development and utilization of atomic energy for peaceful purposes *to the maximum extent consistent with* the common defense and security and with *the health and safety of the public.*

42 U.S.C. § 2013 (emphasis added).

It is clear, therefore, that Congress intended to provide for the protection of the public in the Act. Indeed, one of the essential purposes of the legislation was to create standards for the development and utilization of atomic energy which were consistent with the public health and safety. Recognizing the primary importance of the public interest factor, the court in *Crowther v. Seaborg,* 312 F.Supp. 1205, 1216 (D.Colo. 1970), stated that since "it was the intent of Congress in passing the [Atomic Energy] Act to protect the health of the class of which plaintiffs are members, then when they allege disregard of that interest, they are persons allegedly aggrieved or adversely affected within the meaning of the statute and have standing to sue."

■ As the *Crowther* opinion suggests, the concept of standing is analogous to the first factor to be considered in deciding whether a private cause of action should be implied. It is necessary in both circumstances to determine whether the plaintiff is a member of a class whose interests are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). I find

---

2. *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

3. *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

4. *Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

5. *Tunstall v. Brotherhood of Locomotive Firemen,* 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944).

6. *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

7. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

8. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646, *reh. denied* 415 U.S. 952, 94 S.Ct. 1478, 39 L.Ed.2d 568 (1974).

9. *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).

10. *Texas & Pacific Ry. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

it beyond cavil that plaintiffs, as members of the public, possess interests within the zone of interests to be protected by the Atomic Energy Act.[11]

(2) The legislative history appears to be silent regarding private enforcement of the Act's provisions. Nonetheless, the Supreme Court has recognized that "in situations in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling." *Cort v. Ash, supra,* at 82, 95 S.Ct. at 2090, 45 L.Ed.2d at 39.

The present case differs significantly in this respect from *Amtrak* and *Barbour, supra.* In those cases, the Court noted that the legislative history of the enforcement provisions of the statutes in question quite clearly indicated that Congress intended to restrict private causes of action to a very limited scope. No such indications exist in the legislative history of the Atomic Energy Act.

(3) In *Cort, Amtrak,* and *Barbour, supra,* one of the chief reasons cited by the Supreme Court for denying a private cause of action was its finding that private actions would be detrimental to the effectuation of the purposes intended to be served by the legislation in question. No such effects would result from permitting private actions under the Atomic Energy Act. Unlike *Cort,* where the Court stated that the congressional intent to protect the class of which plaintiff was a member "was at best a subsidiary purpose" of the statutory provision under consideration, it is evident from the discussion above that the Atomic Energy Act was clearly intended to protect plaintiffs' class in this case. Private causes of action would thus tend to "make effective the congressional purpose." *J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

In *Amtrak,* the Court was concerned that in light of the purpose of the Amtrak Act to achieve economic viability in a basic rail passenger system by eliminating uneconomic routes, permitting a private cause of action would create the potential "for a barrage of lawsuits that, either individually or collectively, could frustrate or severely delay any proposed passenger train discontinuance. . . . This would completely undercut the efficient apparatus that Congress sought to provide for Amtrak to use in the 'paring of uneconomic routes.'" 414 U.S. at 463, 94 S.Ct. at 696, 38 L.Ed.2d at 655.

Conversely, there is no threat in the case at bar of private lawsuits jamming congressionally-established machinery. By permitting the public to sue for violations of the Atomic Energy Act, one of the essential purposes of the Act is being served insofar as the public health and safety can be better protected. At the same time, such actions would not interfere with the licensing function of the NRC since objections to proposed projects—as opposed to past violations—must be made within the framework of administrative proceedings, not in the federal courts.

(4) Finally, this is not an area in which plaintiffs' rights are adequately protected by state law, nor is it one which is basically the concern of the states. Should plaintiffs be denied the opportunity to bring a cause of action under the Atomic Energy Act, it is a virtual certainty that no action exists under state law sufficient to compensate them for the alleged wrongful acts of defendants. This is not a case in which the same alleged wrongdoing constitutes both a statutory violation and a common law tort so that plaintiffs might be compensated under either theory. *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

---

11. The class is obviously large. In order to have standing to bring an action under the Act, however, a person must satisfy not only the "zone of interests test," but also the more fundamental "injury in fact test." Plaintiffs here have demonstrated injury in fact by alleging that as members of the purchasing cooperatives their utility rates will increase owing to the interest payable by the cooperatives on the loans they received to cover the cost of the purchase of the 20 percent ownership interest in Fermi 2.

Plaintiffs must be afforded an opportunity to seek redress for injuries allegedly suffered as a result of defendants' violation of the Atomic Energy Act. Defendants have contended that the sole non-criminal federal remedy for a violation of any provisions of the Act is found in section 2.206 of the regulations, 10 CFR § 2.206. That section permits any person to file a request for the appropriate NRC officials to institute a show cause proceeding against an alleged violator of the Act, which action may result in modification, suspension, or revocation of the license of the offender, "or for such other action as may be proper." Presumably "such other action" would include imposition of civil penalties pursuant to § 234 of the Act. An agency action, however, cannot afford redress to one harmed by a violation of the Act since the NRC has no power to grant reparation in money for past violations. *See Fitzgerald v. Pan American World Airways, Inc.*, 229 F.2d 499, 502 (2d Cir. 1956).

In short, plaintiffs are members of the public, for the protection of whom the Atomic Energy Act expressly provides. There is no indication that private suits will be detrimental to the purpose of the Act; to the contrary, those purposes will be furthered by permitting the class in which the statute creates a federal right to seek judicial relief for alleged unlawful conduct. Such actions will not intrude upon administrative licensing procedures, nor will they tend to abrogate the NRC's statutory authority. When, as here, administrative remedies are insufficient to adequately protect the public, and the legislation in question mandates such protection, it is the duty of the courts to make judicial relief available "where necessary to achieve that result." *J. I. Case Co. v. Borak,* 377 U.S. at 432, 84 S.Ct. at 1560.

My conclusion that a private cause of action may be implied under the Atomic Energy Act does not end the discussion, however. I must also decide whether this court, having jurisdiction over the case, should proceed immediately to adjudicate the matter. As was noted above, section 2.206 of the regulations promulgated under the Atomic Energy Act provides a means whereby any person may request the NRC to institute a show cause proceeding against an alleged violator of the Act. It must now be determined whether the doctrine of primary jurisdiction requires this court to await action by the administrative agency before moving ahead.

In his treatise on Administrative Law, Professor Davis states:

"[T]he doctrine of primary jurisdiction determines whether the court or the agency should make the initial decision. The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court." K. Davis, *Administrative Law Treatise* § 19.01, at 2–3 (1958).

The doctrine has been employed by the Supreme Court in a wide range of circumstances. It has generally been considered appropriate in cases where a claim, although originally cognizable in the courts, requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. *See International Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10, *reh. denied* 402 U.S. 967, 91 S.Ct. 1607, 29 L.Ed.2d 132 (1971); *Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). The Supreme Court has also interpreted primary jurisdiction to call for initial judicial deference to administrative proceedings in cases raising issues of fact not within the conventional experiences of judges, or in cases requiring the exercise of administrative discretion. *See, e. g., United States v. Western P.R. Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). In *Port of Boston Marine Terminal Assoc. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 91

S.Ct. 203, 27 L.Ed.2d 203 (1970), the Court held that when there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for government supervision or control of the particular industry or activity involved.

■ The instant case falls within the scope of the primary jurisdiction doctrine. It is clear that the NRC has broad regulatory authority under the Atomic Energy Act. While the Commission is primarily concerned with administering an efficient licensing system, sections 2.200–2.206 of the regulations expressly provide for administrative enforcement procedures with respect to violations of the Act or of any rules, orders, or regulations. The cardinal issue in this case is whether the transaction between the two co-ops and Detroit Edison violated any provisions of the Act or any regulations thereunder. Resolution of that issue requires extensive factual determinations in an area in which the NRC possesses the expertise to handle intricate questions of construction. It must be determined, for example, whether the sale of a bare 20 percent ownership interest is a "transfer" or an "acquisition" of a utilization facility as those terms are used in the regulations. It must also be decided whether a plant that is merely under construction is in fact a "production or utilization facility" at all. The NRC is well-equipped to deal with these difficult questions, and the primary jurisdiction doctrine requires a court to hold its hand in such circumstances. Deference to the administrative body is particularly appropriate in this case in light of the fact that one of the plaintiffs has filed a request for administrative action pursuant to section 2.206 of the regulations. For the court to proceed further at this point would be duplicative and create the potential for inconsistent results.

In *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), the Supreme Court was faced with a situation closely analogous to this one. There, suit was filed charging that the Sherman Act had been violated by defendants by unilaterally transferring plaintiff's membership in the Exchange without notice and hearing. Such action was allegedly contrary to certain provisions of the Commodity Exchange Act. The Court held that the antitrust action should be stayed in order to afford the Commodity Exchange Commission the opportunity for administrative consideration of the dispute. It was noted that "[u]nder the relevant regulations, any interested person having information concerning such [a] violation [of the Commodity Exchange Act] may request the Commission to institute proceedings, or the Commission may initiate proceedings on its own motion, and there is provision for persons seeking intervention in such proceedings." 409 U.S. at 297, 93 S.Ct. at 577–78, 34 L.Ed.2d at 532–33 (footnotes omitted).

The crux of the matter in *Ricci* was whether "conduct seemingly within the reach of the antitrust laws is also at least arguably protected or prohibited by another regulatory statute enacted by Congress." *Id.* at 299–300, 93 S.Ct. at 579, 34 L.Ed.2d at 534. In the view of the majority,

a prior agency adjudication of this dispute will be a material aid in ultimately deciding whether the Commodity Exchange Act forecloses this antitrust suit, a matter that seems to depend in the first instance on whether the transfer of Ricci's membership was in violation of the Act for failure to follow exchange rules. That issue in turn appears to pose issues of fact and questions about the scope, meaning, and significance of Exchange membership rules. *These are matters that should be dealt with in the first instance by those especially familiar with the customs and practices of the industry and of the unique marketplace involved in this case. Id.* at 305, 93 S.Ct. at 582, 34 L.Ed.2d at 537 (emphasis added).

The Court reached this conclusion even though the Commission was under no absolute duty to institute proceedings following a request for action by an interested person, the complainant had to intervene to become a party, and agency remedies were discretionary. The agency, said the Court,

"should at least be requested to institute proceedings." *Id.* at 304, 93 S.Ct. at 582, 34 L.Ed.2d at 537.

Relying on *Ricci*, the Court held in *Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973), that an action brought solely on the basis of alleged violations of the Commodity Exchange Act should be stayed under the primary jurisdiction doctrine. These types of claims were to be "routed in the first instance to the agency whose administrative functions appear to encompass adjudication of the kind of substantive claims made against the Exchange in this case." *Id.* at 115, 94 S.Ct. at 467, 38 L.Ed.2d at 347. *See also Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Weinberger v. Bentex Pharmaceuticals Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973).

These cases are controlling here. As noted above, section 2.206 of the regulations permits any person to request agency action against alleged violators of the Act. Section 2.714, 10 CFR § 2.714, provides that "[a]ny person whose interest may be affected by a proceeding and who desires to participate as a party shall file a written petition under oath or affirmation for leave to intervene." A denial of a petition for leave to intervene may be appealed to the Atomic Safety and Licensing Appeal Board. 10 CFR § 2.714a. Additionally, a person who is not a party may, in the discretion of the officer presiding at the hearing, be permitted to make an appearance by making an oral or written statement of his position on the issues. 10 CFR § 2.715. It is pursuant to this procedure that plaintiffs must first seek a determination from the NRC as to the legality of the February 1977 transaction between the co-ops and Edison.

I reiterate that the administrative proceedings with respect to Edison's amendment to its permit to add the co-ops as part owners are not sufficient to protect the interests that plaintiffs are asserting here. It is not the purpose of those proceedings to consider alleged violations of the Act. The section 2.206 route is the one to which I presently defer. Should the agency officials who consider requests for action under section 2.206 decide not to institute proceedings, it would then be appropriate for this court to look into the legality of the transaction. As stated in *Ricci, supra*, "surely if administrative proceedings are sought in vain, there would be no further problem for the . . . court." 409 U.S. at 304 n. 14, 93 S.Ct. at 582 n. 14, 34 L.Ed.2d at 537 n. 14. Section 2.206 requires that the requested proceeding shall be instituted or that the person who made the request shall be advised in writing that no proceeding will be instituted within a reasonable time after a request is received. One of the plaintiffs here filed a request for action under section 2.206 in late November 1977. If no response is made to that request within a reasonable period of time, plaintiffs may so inform the court and the matter will proceed in this forum.

In sum, I hold (1) that this court has jurisdiction over this case, and (2) that the proceeding is stayed pending further action by the Nuclear Regulatory Commission under section 2.206 of the regulations.