UNITED STATES of America

v.

CITY OF PHILADELPHIA; Frank L. Rizzo, Mayor of Philadelphia; Hillel S. Levinson, Managing Director; Marvin E. Aronson, M.D., Medical Examiner; Irvin R. Davis, Director of Finance; Joseph F. O'Neill, Police Commissioner; Harry G. Fox, Deputy Police Commissioner; Morton B. Solomon, Deputy Police Commissioner; Frank A. Scafidi, Chief Inspector of the Philadelphia Police Department; Richard Bridgeford, Chief Inspector of the Philadelphia Police Department; Joseph Golden, Chief Inspector of the Philadelphia Police Department; Robert Wolfinger, Chief Inspector of the Philadelphia Police Department; James Herron, Chief Inspector of the Philadelphia Police Department; John McHugh, Chief Inspector of the Philadelphia Police Department; Ferdinand Spiewak, Chief Inspector of the Philadelphia Police Department; Gregore Sambor, Chief Inspector of the Philadelphia Police Department; Edwin S. Parker, Chief Inspector of the Philadelphia Police Department; William Devlin, Chief Inspector of the Philadelphia Police Department; John Craig, Chief Inspector of the Philadelphia Police Department; David Cordivari, Captain of the Philadelphia Police Department; Edmund Lyons, Superintendent of Prisons.

Civ. A. No. 79–2937.

United States District Court,
E. D. Pennsylvania.

Oct. 30, 1979.

L. Michael Thrasher, Drew S. Days, III, Charles Tiefer, Martha Fleetwood, Frederick S. Mittelman, Washington, D. C., Peter F. Vaira, John Penrose, William J. McGettigan, Howard D. Finkelstein, Philadelphia, Pa., for plaintiff.

Sheldon Albert, John R. Padova, James E. Beasley, Ellen Q. Suria, Richard A. Sprague, Edward H. Rubenstone, Stephen T. Saltz, Mark Goldberg, Ralph J. Teti, James M. Moran, Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

In this widely publicized lawsuit, the United States government, through its At-

torney General, seeks broad declaratory and equitable relief against the allegedly unconstitutional practices and policies of the Philadelphia police department. In addition to the City of Philadelphia itself, the named defendants include the Mayor, the Managing Director, the Medical Examiner, the Director of Finance, and the Police Commissioner, as well as some fifteen high-ranking police officials.

The complaint alleges that there exists a pervasive pattern of police abuse in Philadelphia, the effect of which is to deny basic federal constitutional rights to persons of all races, colors, and national origins. This abuse is said to consist of such practices as, for example, using deadly force where it is unnecessary, physically abusing arrestees and prisoners, extracting information and confessions by means of physical brutality, stopping persons without probable cause, and conducting illegal searches and seizures. Moreover, the plaintiff charges that the police department actually facilitates these abusive practices by maintaining policies and procedures which thwart the investigation of complaints and shield the officers involved from any kind of discipline or scrutiny. Thus, for example, it is alleged that the department fragments abuse investigations, suppresses evidence that inculpates police officers, accepts implausible explanations of abusive conduct, harasses complainants and witnesses, and prema-

turely terminates investigations of police brutality.

The government also charges that some or all of the individual defendants are personally responsible for promulgating and perpetuating these practices in furtherance of a deliberate effort to foster, as well as to condone, the intrusion upon civil rights by police officers.

Finally, the complaint alleges that while police abuse in Philadelphia is visited to some extent on all segments of the population, it has a disproportionately severe impact on black and Hispanic persons. This case, therefore, also contains an aspect of racial discrimination.

In their answer to the complaint, the defendants raised the question of the Attorney General's standing to maintain this lawsuit. On my order, the parties addressed the standing issue in extensive briefs, the quality of which was exceptional. After considering these briefs at great length and after my own research, I conclude that there exists no authority, express or implied, for the bringing of this lawsuit. Rather, I hold that the Attorney General has no standing before this court when he seeks to advance the civil rights of third persons, absent an express grant of the necessary power by an Act of Congress. This complaint, therefore, must be dismissed without ever testing the merits of its deeply serious charges.[1]

1. I note that the defendants have not filed a motion to dismiss the complaint under Fed.R. Civ.P. 12(b). This fact, however, does not prevent me from dismissing the suit. First, the question of standing goes to the subject matter jurisdiction of this court. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *Independent Investor Protective League v. Securities and Exchange Commission,* 495 F.2d 311, 313 (2d Cir. 1974). As such, it can be raised by the court *sua sponte. Rauch v. Day & Night Mfg. Corp.,* 576 F.2d 697, 699 and n. 1 (6th Cir. 1978). Thus, it was proper for me to proceed as I did, viz., by notifying the parties that I was concerned about the standing issue, and giving all counsel an opportunity to address the issue in extensive briefs. Cf. *Literature, Inc. v. Quinn,* 482 F.2d 372, 374 (1st Cir. 1973).

Second, there is every reason to believe that defendants would have made a motion to dismiss on the ground of standing if they had not been discouraged from doing so by statements which I made at the pre-trial conference on August 21, 1979. I told the defendants "that it's doubtful the issues in this case are going to be handled by a motion for summary judgment or a motion to dismiss and therefore you may wish to give careful consideration as to whether pre-trial pleading skirmishes are really going to accomplish anything for anybody." N.T. 14–15. Later, defendants' counsel stated that "[o]ur expectation this morning before we came into court was to file a Rule 12 motion and to file that by September the 4th." N.T. 24. In response, while assuring counsel that I did not wish to limit him in any way, I reiterated my doubts about the feasibility of resolving this matter on a motion to dismiss the complaint. N.T. 26.

## I. LEGISLATIVE HISTORY

By the filing of this complaint, the Attorney General seeks to obtain broad equitable relief, the effect of which would be to alter the structure and the administration of a major municipal police force. I am told that this sweeping relief is necessary because the present policies and procedures of that police force violate the Constitution and the civil rights laws of the United States. The present issue is whether the Attorney General has the power to maintain such a lawsuit. Surely, the discussion must begin with the history of the attempts in Congress to grant powers of this type to the Attorney General by express statutory enactment. Of overwhelming significance to this case is the fact that on three separate occasions, these attempts have failed.

In an Executive Communication dated April 9, 1956, then Attorney General Herbert Brownell addressed what he viewed as a deficiency in the available means for enforcing 42 U.S.C. § 1985. That section, of course, attempts to provide relief from conspiracies to interfere with constitutional rights. Mr. Brownell pointed out that under the terms of the statute, such conspiracies "can be redressed only by a civil suit by the individual injured thereby." He urged the Congress, therefore, to consider "a proposal authorizing the Attorney General to initiate civil action where necessary to protect the rights secured by that statute." H.R.Rep. No. 291, 85th Cong., 1st Sess., *reprinted in* [1957] U.S.Code Cong. & Admin.News, pp. 1966, 1978, 1980.

Attorney General Brownell's suggestion was incorporated in the proposed Title III of the Civil Rights Act of 1957, which began in Congress as bill No. H.R. 6127. A majority of the House Judiciary Committee recommended approval of this legislation, including Title III. As proposed, the bill "amends existing law so as to permit the Federal Government to seek from the civil courts preventive or other necessary relief in civil-rights cases." H.R.Rep No. 291, supra, at 1966. It "provides that the Attorney General may institute for the United States *or in the name of the United States* a civil action for preventive relief whenever a person has committed any acts or practices which would give rise to a cause of action under the existing law as contained in section 1985." Id. at 1974. Moreover, the committee majority noted that the proposed amendment "authorizes the Attorney General to institute an action whenever any persons are about to engage in those acts and practices" which would violate the statute, thus clearly demonstrating that Title III contemplated suits for injunctive relief. Id. at 1975.

Finally, the report was careful to point out that, as proposed, Title III would not create any new rights. Rather, the bill created "a *new remedy*" (emphasis added), because its effect was "to provide the Attorney General with the right to bring a civil action . . . to prevent acts or practices" which would violate section 1985. Id. It is evident, therefore, that in the minds of Title III's authors, this remedy did not previously exist.

Not all the members of the House Judiciary Committee joined in hailing the proposed amendments. The minority report on H.R. 6127 described Title III's provisions as "truly shocking." At the heart of the objections was the "blanket authority to institute civil actions" which the new law would confer upon the Attorney General, thereby endowing him "with the privilege of setting up law through injunction." H.R.Rep. No. 291, supra, at 2001.

What concerned the minority most was the extent of intrusion that Title III would

Rarely, if ever, should a court attempt to influence a lawyer's judgment as to the best means of representing his client, and I erred in doing so here. The burden of this error should be made to rest on neither the defendants nor their attorneys. The standing issue was obviously a matter of deep concern to defense counsel. They raised it repeatedly in their answer to the complaint, and they submitted a highly persuasive brief on the subject in response to my order. Surely, the defendants should not be penalized for failing to make a motion under Rule 12 when they had reason to believe that the filing of such a motion would be contrary to the wishes of the court.

permit upon the authority of state and local officials. Of particular relevance for our purposes is the fact that the minority report anticipated the very lawsuit that the Attorney General now has brought. "Consider the effect of this legislation on State and local law enforcement; police officers will be faced with the threat of a Federal injunction." Id., at 2001. The report went on to point out the plight into which local officials will be thrust when they are faced with "an all-powerful Federal Government which proceeds against them by way of injunction." Further objection was raised on the ground that "of course these proceedings can and doubtless will be brought at the most inconvenient times, so far as conducting the affairs of those particular officials are [sic] concerned." Id.[2]

Finally, the minority concluded their condemnation of Title III with a fearful prediction: "Armed with the powers that this bill would expressly confer, a politically minded Attorney General, in combination with an unreasonable Federal district judge, could terrorize the people in any community. No Attorney General should ever seek such powers and Congress ought never to grant them." Id. at 2015.

The concerns raised by the committee minority in the House were echoed loudly when the bill reached the floor of the Senate. Many senators decried the federal intrusion upon local authority that Title III would permit. Thus, Senator Kefauver expressed his opposition by stating that "[t]he Federal Government cannot take it upon itself to referee the police forces and the sheriff's officers of every county and locality in the nation." 103 Cong.Rec. 12530 (1957). Rather, the Senator felt that federal supervision need not extend beyond assurance of the right to vote. "A sheriff who practices brutality for racial reasons

will not long remain in office." Id. Similarly, Senator Saltonstall condemned "the use of compelling force by the Federal Government" in what he termed "direct interference with home rule, local administration and state administration." Id. at 12541. In the same vein, Senator Hickenlooper proclaimed his opposition to Title III because it represented "a long step toward the further concentration of autocratic and bureaucratic authority in the central Government at Washington." Id. at 12549.

After much debate, the opposition prevailed, Title III was deleted, id. at 12565, and the bill was approved by the Senate, minus the controversial amendment to 42 U.S.C. § 1985. Id. at 13900. Thereafter, the House agreed, and similarly approved H.R. 6127 without the provisions of Title III. Id. at 16112–13. With President Eisenhower's signature, the bill became the Civil Rights Act of 1957, Pub.L. No. 85–315, 71 Stat. 634 (1957). The much disputed Title III had failed to become law.[3]

An attempt to resurrect Title III was made in 1960. The resulting storm of protest on the floor of the Senate is best illustrated by the remarks of Senator Ervin. He said that this law would "destroy the states of the union" because it would give the Attorney General "the arbitrary power to supervise the actions of states, the actions of cities, the actions of towns, the actions of counties." The Senator went on to state that while he opposed such power in the hands of any official, he found it particularly offensive in the Attorney General, "for not only is he a government officer, but he is also, in every case of which I've ever heard, a politician." Under Title III, "the Attorney General could virtually convert Federal district courts into administrative branches of the executive department of the Federal Government."[4] Final-

---

**2.** The timing of the present suit is a matter of serious concern to me. See Part VI, infra.

**3.** By no means was the 1957 Civil Rights Act rendered insignificant by the deletion of Title III. On the contrary, this legislation created the United States Commission on Civil Rights. See 42 U.S.C. § 1975, et seq.

**4.** The kinds of intrusions on local authority feared by the Senate opponents of Title III were graphically illustrated in the rhetorical question of Senator Talmadge:

Mr. TALMADGE. Assume that a citizen of Arizona were to allege to the Attorney Gen-

ly, the Senator capped his protests with some disconcerting predictions:

> If the occupant of this office should happen to be a pragmatic politician, or a so-called civil rights zealot, or a person susceptible to coercion by pressure groups, he could employ part III as an intimidating club, and thereby control or demoralize State and local governments.
>
> . . .
>
> The State or local official could do one of three things. He could submit to the threat, and thus permit a Federal officer to dictate how the functions of a State or local office are to be discharged. He could relinquish his State or local office, and thus escape further harassment and hazard. And, finally, he could stand up and fight for his convictions, even to the point of defending a lawsuit in a Federal district court.

106 Cong.Rec. 5160.61 (1960).[5]

Meanwhile, the attempt to revive Title III made little progress in the House. Although a subcommittee recommended approval of this legislation as part of the pending Civil Rights Act, the full Judiciary Committee deleted Title III in its entirety. H.R.Rep. No. 956, 86th Cong., 2d Sess., *reprinted in* [1960] U.S.Code Cong. & Admin. News, pp. 1925, 1939, 1957. When the Civil Rights Act of 1960 became law, it contained no remnant of the powers that Title III would have vested in the Attorney General. See Pub.L. 86–449, 74 Stat. 86 (1960).

The proponents of Title III tried to revive the passage of its provisions once again in 1964. This attempt, too, was short-lived. See H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Admin.News, pp. 2355, 2391, 2411. The law that finally became the now-celebrated Civ-

il Rights Act of 1964 did broaden somewhat the Attorney General's authority to initiate suit, but this was limited to instances of infringement on certain specified rights, such as employment or voting. The Act contained no broad grant of authority to sue for enforcement of the civil rights laws. See Pub.L. 88–352, 78 Stat. 241 (1964).

This legislative history cannot be ignored when considering the standing of the Attorney General to bring the present lawsuit. The complaint in this case prays for extremely broad injunctive relief against local officials whose duty it is to administer a municipal police department. The stated ground for this relief is the allegation that by their policies and practices, the defendants are violating the civil rights laws of the United States. The Attorney General would thus have me enter an injunction substituting his views for those of the defendants as to how the Philadelphia Police Department should be run. It is clear to me, therefore, that by filing this complaint, the Attorney General is attempting to exercise the very power which the Congressional opponents of Title III relied upon in defeating that legislation. The defendants argue that I cannot recognize a power which Congress has thrice refused to grant. I find this position to be entirely persuasive.

The legislative history discussed above has been relied upon by the Courts of Appeals for the Fourth and Ninth Circuits in rejecting the Attorney General's claims of standing to sue. In *United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979), the Attorney General brought suit against a state facility for mentally retarded persons, alleging that the institution maintained unsafe and unsanitary conditions, resulting in injuries and death. The complaint charged

---

eral that the location of a road by the State Highway Department of Arizona in some way deprived him of the equal protection of the laws. Could not the Attorney General intervene and sue for an injunction against the highway department in Arizona with respect to the location of that particular highway?

Mr. ERVIN. Oh, yes. It has been held many times that matters of that kind can be considered under the equal protection-of-the-

laws clause. That is only one of the thousands of situations in which the Attorney General could bring suits.

106 Cong.Rec. 5160 (1960).

**5.** I note that Senator Ervin was regarded as a leading constitutional scholar among his Senate colleagues. See the remarks of various Senators, 120 Cong.Rec. 41735–45 (1974). See also id. at 10983–84, 10987, 10992–93.

that these conditions violated the civil rights secured for the patients of the institution by the eighth, thirteenth, and fourteenth amendments to the Constitution. The plaintiff sought injunctive relief.

After holding that Congress had not expressly authorized the suit,[6] the court of appeals went on to consider whether the federal government "has some interest that can be construed to warrant an implicit grant of authority." 600 F.2d at 1298. One of the principal factors persuading the court that no such implied authorization existed was "the repeated failure of Congress to authorize such suits." Id. at 1299. The panel made special note of the fact that the Civil Rights Act amendment rejected by Congress in 1964 would presumably have authorized the very suit which the Attorney General was attempting to prosecute. The court pointed out that the amendment failed because it would vest the Attorney General " 'with broad discretion in matters of great political and social concern.' " Id. at 1300, quoting H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Admin.News, pp. 2391, 2450.

The same holding was reached in *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977). Like *Mattson*, the *Solomon* case concerned an attempt by the Attorney General to obtain injunctive relief against a state hospital for the mentally retarded. After refusing to find express authorization for the suit, the court also declined to find implicit authority. In so holding, the court said: "It is significant that several attempts extending over a period of twenty years to enact legislation empowering the Attorney General to bring the type of action represented by the instant case have failed of enactment." 563 F.2d at 1125, n. 4.

Despite these authorities, however, the Attorney General argues that the legislative history of Title III should not be read as depriving him of standing to sue for enforcement of the civil rights laws. On the contrary, plaintiff suggests that the legislative history is irrelevant to the issue now before me. He submits that in reaching the opposite result, *Mattson* and *Solomon* misconstrued the actions of Congress. He contends that both cases were "incorrectly decided" and he asks me not to follow them.[7]

In support of his argument, the plaintiff points out that the Title III legislation proposed in 1957 and 1960 would only have given the Attorney General authority to enforce by civil suit the provisions of 42 U.S.C. § 1985. That statute, of course, deals only with *conspiracies* to violate civil rights. Thus, the plaintiff submits that Congress' failure to enact Title III was a narrow and limited action. He argues that this action should have no bearing on the Attorney General's power to bring a civil suit which seeks to enjoin the deprivation of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments.

█ It is quite true that a distinction exists between the present suit and those that would have been included within the language of Title III. Plaintiff, however, has completely missed the significance of that distinction. The fact is that by filing this complaint, as well as the ones in *Mattson* and *Solomon*, the Attorney General seeks to exercise a much broader power than that which Title III would have bestowed upon him. Indeed, the plaintiff's power to sue under Title III would have been limited to those instances where the

---

**6.** The Attorney General also argues that he has express statutory authorization to bring the suit now before me. This is a claim I reject. See part II, infra.

**7.** I recognize, of course, that I am not bound by the decisions of Courts of Appeals in other circuits. *Ghandi v. Police Department of City of Detroit*, 74 F.R.D. 115, 122–23 (E.D.Mich. 1977); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp.

457 (E.D.Pa.1972). Nevertheless, in the absence of contrary authority from the Supreme Court or the Court of Appeals for the Third Circuit, the decisions of other Courts of Appeals are entitled to careful consideration, and are not to be lightly ignored. *Gerace v. Liberty Mutual Insurance Co.*, 264 F.Supp. 95, 97 (D.D. C.1966); *Lang v. Elm City Construction Co.*, 217 F.Supp. 873, 877 (D.Conn.1963).

alleged constitutional deprivation was conspiratorial in nature.[8] *Griffin v. Breckenridge,* 403 U.S. 88, 103, 91 S.Ct. 1790, 1799, 29 L.Ed.2d 338 (1971); *Robinson v. McCorkle,* 462 F.2d 111, 113 (3d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1977). Here, by contrast, the Attorney General asserts standing to redress *all* violations of constitutional rights, without having to plead or prove the existence of a conspiracy.[9] Yet, the above discussion demonstrates clearly that Congress thought the powers proposed under Title III were excessively broad. The fact that the powers now claimed by the plaintiff are still broader serves only to make them even more objectionable.

Moreover, the Attorney General cannot possibly argue that while it was debating Title III, Congress had in mind *different* Constitutional rights than those involved in the present case. During the 1957 debates on Title III, Senator Allott read into the record a list of rights, compiled by the Attorney General, which had been recognized as being among those guaranteed by the Constitution. The obvious purpose was to illustrate the rights to which the pending legislation referred. The list included, *inter alia,* the right to be secure from unlawful searches and seizures; the right to assemble peaceably free from unreasonable restraint by state or local officials; the right, when charged with a crime, to a fair trial; the right not to be tried by ordeal or summarily punished other than in the manner prescribed by law; the right not to be forced to confess an offense; the right to be free from brutality at the hands of prison officials; and the right of a prisoner to protection by the officer having him in custody.

103 Cong.Rec. 12542 (1957). In one form or another, the present lawsuit seeks to vindicate each of these rights.

It is clear, too, that the objections raised by the opponents of Title III are readily applicable to the power which the Attorney General now purports to exercise. The focus of the opposition was the extent of federal intrusion on local authority that Title III would have permitted. Now the Attorney General claims to possess a power which closely resembles the one that Title III would have granted, except that it is unfettered by the special pleading requirements of section 1985.[10] Such a power would permit an even deeper and more pervasive intrusion on the authority of local officials. This is certainly illustrated by the complaint in this case which seeks fundamental changes in the operating policies and procedures of the fourth largest municipal police force in the United States.

■ In summary, by bringing this lawsuit, the Attorney General is seeking to utilize a power which Congress has refused to grant. Moreover, the present exercise of that power is even broader than Title III would have permitted. It will be remembered that Title III was itself defeated because the powers it would have bestowed were considered too broad. I firmly reject, therefore, the plaintiff's suggestion that the legislative history discussed above, and relied upon by *Mattson* and *Solomon,* is irrelevant to this case. On the contrary, this history of Congressional action is highly relevant, and suggests almost conclusively that the Attorney General is without authority to bring this action.

---

**8.** The Attorney General's power to enforce subsection (3) of § 1985 would be further limited to those instances where the alleged conspiracy was motivated by an invidious, class-based discriminatory animus. *Griffin v. Breckenridge,* supra, 403 U.S. at 102, 91 S.Ct. at 1798; *Jennings v. Shuman,* 567 F.2d 1213, 1221 (3d Cir. 1977). It is possible that suits for enforcement of subsections (1) and (2) might also be subject to this additional limitation. See *Herrmann v. Moore,* 576 F.2d 453, 458 (2d Cir.), cert. denied, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Jones v. United States,* 536 F.2d 269,

271 (8th Cir. 1976), cert. denied, 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 750 (1977). But see *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1341-42 (7th Cir.), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

**9.** Similarly, under his present theory, the Attorney General's power to sue would not be restricted by the limitation discussed in note 8, supra.

**10.** See notes 8 and 9 and accompanying text, supra.

In addition to challenging the relevance of Title III's history, the Attorney General has advanced three theories in support of his claim to standing. He submits that his authority to maintain this lawsuit can be based, alternatively, on: (1) express statutory enactments; (2) implied statutory authorization; or (3) the inherent power of the federal government. While these three separate theories involve varying considerations, they must each be evaluated in light of the legislative history discussed above.

## II. EXPRESS STATUTORY AUTHORITY

■ The Attorney General argues that he is expressly authorized to bring this action by 28 U.S.C. § 518(b), which reads in its entirety as follows:

> When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.

According to the plaintiff's theory, this statute would permit the Attorney General to institute litigation regarding *any* matter in which he thinks the United States may be "interested." Such a power would extend infinitely beyond the mere authority to enforce the civil rights laws by civil suits. This argument is advanced despite the fact that the statute offers no hint as to what the term "interested" means or how the Attorney General is to make the necessary determinations. It takes a vivid imagination indeed to believe that Congress would grant such a tremendous power by means of such an innocuous statute.

Moreover, if the Attorney General's position is correct, it becomes very difficult to understand the battle-scarred history of Ti-

tle III. The predecessor statute of Section 518 was 5 U.S.C. § 309. This latter provision was originally enacted on June 22, 1870, containing language which is substantially similar to the present version.[11] In 1966, it was recodified with some language changes as the present Section 518 of Title 28. See Pub.L. 89–554, § 4(c), 80 Stat. 613–14 (1966). It is clear, however, that the 1966 changes were limited to recodification. They were not intended to effect any substantive change in the statute. 112 Cong. Rec. 17011 (1966). Therefore, if Section 518 truly grants to the Attorney General the powers that he claims, then he has had those powers since as early as 1870. This, of course, would have rendered superfluous the entire furor generated over Title III. Indeed, if the plaintiff's theory is correct, Title III would have had no independent meaning at all in 1957 or 1960, since the predecessor statute of Section 518 already vested the Attorney General with the powers that Title III sought to grant. Is it possible that this enormously significant fact escaped the attention of Title III's authors, as well as President Eisenhower, Attorney General Brownell, and the full ranks of the opposition in Congress?

Obviously, the plaintiff's position is, to say the least, highly improbable. The fact is that Section 518 grants none of the powers that the Attorney General suggests. On the contrary, it is merely a housekeeping provision which pertains to the internal organization of the federal government. I hold that it provides no basis for the Attorney General's authority to bring this civil action. See *United States v. Solomon*, 419 F.Supp. 358, 362–63 (D.Md.1976), aff'd, 563 F.2d 1121, 1124 (4th Cir. 1977); see also *United States v. Mattson*, supra, 600 F.2d at 1297, n. 1; *United States v. Daniel, Urbahn, Seelye and Fuller*, 357 F.Supp. 853, 858 (N.D.Ill.1973).

---

11. Except when the Attorney–General in particular cases otherwise directs, the Attorney-General and Solicitor-General shall conduct and argue suits and writs of error and appeals in the Supreme Court and suits in the Court of Claims in which the United States is interested, and the Attorney-General may, whenever he deems it for the interest of the United States, either in person conduct and argue any case in any court of the United States in which the United States is interested, or may direct the Solicitor-General or any officer of the Department of Justice to do so. Revised Statutes § 359 (1870).

■ Next, the Attorney General argues that he is authorized to maintain this suit by statutes which give him authority to sue for the purpose of preventing discrimination in federally funded programs. Specifically, the plaintiff refers here to 42 U.S.C. § 2000d; 42 U.S.C. § 3766(c)(3); 42 U.S.C. § 6727(b); and 31 U.S.C. § 1242(g).

It is perfectly true that each of these statutes authorizes the Attorney General to bring suit against state or local government units when he has reason to believe that federally funded programs are being administered by these government units in a discriminatory manner. The scope of such a suit, as well as the extent of its intrusion on local authority, however, would necessarily be limited to the particular federally funded program or programs involved. The court could grant injunctive relief altering the manner in which the relevant program is administered, and it could suspend, terminate, or even order repayment of federal funds spent in support of that program. This is very different from the vast and sweeping relief that the Attorney General now seeks. The complaint here goes far beyond the limits of any federally funded program. I am asked in this case to order changes in the practices and procedures of an entire police department, as well as a prison system, a medical examiner's office, and several other municipal bureaus. Nothing contained in the statutes which the Attorney General has cited could possibly be read as authorizing him to seek such expansive relief. In fact, one of the provisions cited by the plaintiff, a part of the Omnibus Crime Control Act, is preceded by another subsection which evidences a Congressional *hostility* towards the kind of pervasive intrusion on local authority that this lawsuit might permit:

> Nothing contained in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control

over any police force or any other law enforcement and criminal justice agency of any State or any political subdivision thereof.

42 U.S.C. § 3766(a).

■ The complaint in this case includes the charge that the defendants have discriminated on the basis of race, color or national origin in distributing the benefits of certain unspecified federally funded programs. See complaint paragraph 48. As expressed above, I do not question the authority of the Attorney General to maintain a civil suit for the purpose of preventing such discrimination. This is one aspect of the complaint, therefore, that I shall not dismiss. On the contrary, I will retain jurisdiction of this case for the limited purpose of adjudicating the charge that the defendants have discriminated in the administration of programs financed with federal funds.[12] Any relief granted, of course, will not extend beyond the perimeters of those programs. See *United States v. Elrod*, No. 76–4768, slip op. at 9–10 (N.D.Ill. May 16, 1978) (mem.)

Nevertheless, it should be obvious that while the complaint is not being dismissed in its entirety, what remains of this case does not even approach the mammoth proportions of the lawsuit which the plaintiff attempts to bring. The statutes relied upon by the Attorney General were never intended to serve as vehicles for the pervasive relief sought here. The suit which these sections authorize is a diminutive dwarf in comparison with the awesome giant that now stands at the bar of this court.

### III. IMPLIED STATUTORY AUTHORITY

■ For the reasons expressed in Part II, *supra*, I am persuaded that the Attorney General has no express statutory authorization for the bringing of this lawsuit. Alternatively, the plaintiff contends that certain statutes imply this authority.

---

**12.** Without the benefit of briefs from counsel, I intimate no view at this juncture as to whether the allegations of discrimination in federally funded programs are sufficiently specific to survive a motion under Fed.R.Civ.P. 12(b). As noted earlier, the defendants have not yet filed any such motion. See note 1, *supra*.

The Attorney General relies primarily here on 18 U.S.C. §§ 241 and 242. These statutes create criminal penalties for deprivations of constitutional rights, effected by means of conspiracy or under color of state law. On their face, these sections neither authorize any civil suit nor create any civil liability. Nevertheless, the plaintiff maintains that a civil suit such as the present one is impliedly authorized because Congress did not intend the criminal remedies of sections 241 and 242 to be exclusive.

In support of his argument the Attorney General relies on *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). There, the government sought reimbursement of more than 3 million dollars expended in raising and removing a barge that the defendant owner had abandoned on the bottom of the Mississippi River. The Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., expressly required the owner to either remove the vessel himself or forfeit his interest in both barge and cargo to the government. In addition, the act provided a criminal penalty. The great cost of removing the vessel, however, far exceeded its salvage value, and thus the government sought reimbursement.

The defendant argued that the remedies provided by the statute were exclusive, thereby forcing the government to be content with selling the barge and retaining the proceeds. The Court did not agree. It held that the broad coverage of the act, combined with Congress' power to regulate interstate commerce and the executive's duty to prevent obstruction of navigable waterways would permit the conclusion that the act implied the remedy which the government sought. Any other result would be inconsistent with the broad Congressional purpose embodied in the statute. 389 U.S. at 203, 88 S.Ct. at 386–87. Significantly, the Supreme Court made special note of the fact that the combination of civil and criminal remedies available under the statute were inadequate to satisfy the government's damages. Id. at 202, 88 S.Ct. at 386.

The Attorney General relies on *Wyandotte* as support for the proposition that he is authorized to maintain the present lawsuit. He submits that the criminal penalties of sections 241 and 242, combined with the individual civil actions authorized by such provisions as 42 U.S.C. §§ 1983 and 1985, evince a broad Congressional purpose to ensure the fullest possible enforcement of the rights guaranteed by the Fourteenth Amendment. The plaintiff argues that the express remedies, i. e., criminal prosecutions and private civil actions, are effective only in correcting "minor wrongs." I am told that these remedies are inadequate to redress widespread and systematic deprivations of civil rights, such as are charged in this case. Moreover, it is suggested that by implying the remedy which the plaintiff seeks, I would be taking a rather small and undramatic step, for "[w]here Congress has authorized criminal penalties, the implication of the authority to bring a civil injunctive suit seems modest indeed." United States Memorandum concerning Standing, Mootness, and the Proposed Future Course of this Litigation, at p. 15.

The Attorney General's argument, though artfully expressed, is substantively unpersuasive. Despite the plaintiff's urgings, I find that the legislative history discussed in Part I, supra, deals a severe blow to the implied authority argument. It is very difficult to see how Congress could intend to do implicitly what it has refused to do expressly. As discussed earlier, the Courts of Appeals for both the Ninth and the Fourth Circuits have relied on this same point in finding that implied statutory authority does not exist. See *United States v. Mattson,* supra, 600 F.2d at 1299; *United States v. Solomon,* supra, 563 F.2d at 1125, n. 4; see also Part I, supra.

Moreover, the plaintiff's reliance on *Wyandotte* is misplaced. It is perfectly true that the Supreme Court there did not limit the government to express statutory remedies. One reason for this, however, was because "[t]here is no indication anywhere else—in the legislative history of the Act, in the predecessor statutes, or in non-

statutory law" that Congress intended the express remedies to be exclusive. 389 U.S. at 200, 88 S.Ct. at 385. Here, by contrast, the legislative history of Title III provides ample indication that exclusivity of express remedies is exactly what Congress did intend. Contrary to what the plaintiff suggests, I believe that the repeated defeat of Title III evinces a Congressional policy against the use of the civil rights laws as a vehicle for excessive federal intrusion on state and local authority. For this reason, Congress denied the Attorney General the broad powers that the Title III legislation would have bestowed upon him. This policy would clearly be violated if I were now to grant by implication what Congress has chosen expressly to deny.

Furthermore, there is no valid analogy between *Wyandotte* and this case on the ground of inadequate remedies. In *Wyandotte,* the maximum criminal fine and the salvage value of the barge together were much less than the actual expenses which the government had incurred. Inadequacy of the remedy was thus a readily ascertainable objective fact, measured in simple terms of dollars and cents. See 389 U.S. at 202, 88 S.Ct. at 386. Here, by contrast, the inadequacy has nothing to do with damage to the government, nor is it susceptible to measurement by any kind of objective standard. Rather, the government argues that the express remedies are inadequate because they reach only "minor wrongs," and they provide no means for redressing "widespread and systematic abuse."

▮ The government's position is simply incorrect. First, the plaintiff has offered no reason why the deterrent effect of criminal prosecutions and individual civil actions would not have widespread consequences. On the contrary, judicial history is replete with instances where a single suit against a single person has brought about momentous changes.

More significantly, the plaintiff has ignored the availability of class action suits. Certainly, the class action is no stranger to civil rights law. With particular reference to this case, it is clear that injunctive relief against patterns of police abuse can be obtained in class suits brought by the injured parties under such statutes as 42 U.S.C. § 1983. Thus, in *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), law enforcement officials were found to have interfered with the formation of a labor union by means of brutality and unlawful arrests, as well as by disrupting assemblies, soliciting false criminal complaints, and filing criminal charges in bad faith. The Supreme Court upheld the grant of an injunction against these activities because "[w]here, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate." 416 U.S. at 815, 94 S.Ct. at 2200. Cited with approval by *Allee* was the decision of the Fourth Circuit in *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966) (en banc). See 416 U.S. at 816, 94 S.Ct. at 2200, n. 9. There, a class of black families obtained an injunction against widespread violations of Fourth Amendment rights by the Baltimore police. The court noted that "[t]hese raids were not isolated instances undertaken by individual police officers. They were rather the effectuation of a plan conceived by high ranking officials." 364 F.2d at 202. See also *Hairston v. Hutzler,* 334 F.Supp. 251 (W.D.Pa. 1971), aff'd, 468 F.2d 621 (3d Cir. 1972); *Hernandez v. Noel,* 323 F.Supp. 779 (D.Conn.1970). Cf. *Schnell v. City of Chicago,* 407 F.2d 1084 (7th Cir. 1969), questioned in *City of Kenosha v. Bruno,* 412 U.S. 507, 512–13, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109 (1973); but see, *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 696, 701, n. 66, 98 S.Ct. 2018, 2038, 2041, 56 L.Ed.2d 611 (1978).

Of course, this court has already seen very serious efforts by class action plaintiffs to obtain broad equitable relief, such as is sought here, in suits against the Philadelphia police department. See *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). It is true that the plaintiffs in *Goode* did not succeed in obtaining this relief. By no means, however, does this failure mean that the class action suit is inadequate as a remedy for systemat-

ic police brutality. The principal deficiency in the *Goode* case was plaintiffs' failure to establish any deliberate plan on the part of the individual city officials who were named as defendants. "As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct." 423 U.S. at 371, 96 S.Ct. at 604. See also id. at 375, 96 S.Ct. at 606. Even a casual reading reveals that the complaint in the instant case was written with *Rizzo v. Goode* in mind. The plaintiff here charges that the individual defendants have deliberately perpetuated certain policies and practices which promote police brutality. The same charge, if made and proved [13] by proper class representatives [14] of the persons allegedly victimized by this brutality, would presumably satisfy the *Goode* standards.

It should be noted, too, that when the Supreme Court decided *Rizzo v. Goode,* supra, the City of Philadelphia was immune from suit because it was not a "person" within the meaning of section 1983. See *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Since then, however, the Supreme Court has opened entirely new vistas of municipal liability under the civil rights laws in suits by private individuals. *Monell v. Department of Social Services of the City of New York,* supra. While the contours and perimeters of this liability are as yet largely undefined, [15] it is clear that *Monell* contemplates the City as a defendant where the acts complained of spring from official policy. 436 U.S. at 690–91, 98 S.Ct. at 2036. The Supreme Court noted expressly that this liability would include "monetary, declaratory, or *injunctive* re-

lief." Id. (emphasis added). It is quite possible, then, that an individual 'or class suit under section 1983 would be precisely the vehicle for redressing the wrongs alleged to exist in this case. See S. Nahmod, Civil Rights & Civil Liberties Litigation, § 6.07, p. 181 (1979).

The point is that the available statutory remedies are not "inadequate" within the meaning of the *Wyandotte* decision. In that case, the express remedies simply provided no means by which the government's expenses could be reimbursed. The court therefore recognized the existence of an implied remedy by which the plaintiff could recoup its monetary losses. This authority has no bearing on a case such as the instant one where the complaint seeks sweeping injunctive relief and the means for securing it exist in express statutory remedies which are available to individual plaintiffs. It may be that the prerequisites for utilizing these remedies are difficult to satisfy. This, however, does not mean that the remedies are inadequate or nonexistent.

The plaintiff also argues that I should find implied authorization for this lawsuit in sections 241 and 242 because it "seems modest indeed" to imply authority for a civil injunctive suit where Congress has already authorized criminal penalties. This theory, of course, is preposterous. The present lawsuit seeks to bring about fundamental changes in the administration of a major municipal police force. If successful it would affect every phase of police work, including the making of arrests, the conduct of investigations, the processing of prisoners, and even the examination of corpses. To call such a suit "modest" in comparison to individual criminal prosecutions is to sneer at reality.

---

**13.** The question of proving such charges troubles me greatly. See Part VI, infra.

**14.** The Supreme Court also expressed its doubts as to whether the individual plaintiffs in *Goode* had established "the requisite 'personal stake in the outcome.' " 423 U.S. at 372–73, 96 S.Ct. at 605, quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**15.** See generally, Blum, *From Monroe to Monell: Defining the Scope of Municipal Liability in Federal Courts,* 51 Temp.L.Q. 409 (1978); Note, *Governmental Liability Under Section 1983 and the Fourteenth Amendment After Monell,* 53 St. John's L.Rev. 66 (1978).

There is yet another reason why I am not persuaded by the plaintiff's argument that I should find a civil remedy in sections 241 and 242. In December of 1978, the United States Commission on Civil Rights held a two day consultation on the subject of police brutality and its effect on civil rights. One of the sessions during this consultation was devoted to the subject of "Remedies." The first speaker at the remedies session was Drew S. Days, III, Assistant Attorney General in charge of the Civil Rights Division of the United States Department of Justice. Most of Mr. Days' presentation dealt with sections 241 and 242, the same provisions upon which the Attorney General now relies for implied authority to bring this suit. Mr. Days described these laws as "the two Federal statutes which have the greatest impact." *Police Practices and the Preservation of Civil Rights,* A Consultation Sponsored by the United States Commission on Civil Rights, Washington, D. C., December 12–13, 1978, p. 138. He went on to describe at some length both the success and the problems that his office had experienced in bringing the criminal prosecutions which 241 and 242 authorize. At no point, however, did Mr. Days discuss, suggest, recommend, or even allude to, the type of civil suit that the Attorney General now attempts to bring. As a matter of fact, his statement seems to foreclose sections 241 and 242 as a source of implied authority for this civil action:

> The chief limitation on the effectiveness of prosecution as a deterrent is in the nature of the criminal charge itself. A prosecution for police misconduct does not address itself to the activities of a police department as such or of a city administration per se, but only to the actions of one or more officers in a given circumstance, framed by and limited to the wording of the criminal indictment. Moreover, criminal prosecutions are reactive litigations involving only the calling to account of individuals who have already engaged in acts of misconduct. Any conscious effort to anticipate instances of police misconduct and head them off before they occur must arise *from some other source than the Federal criminal code.*

*Police Practices and the Preservation of Civil Rights, supra,* at p. 141 (emphasis added). Thus, it is apparent that, in Mr. Days' view at least, sections 241 and 242 should *not* be cited as implicitly sanctioning the present suit.

Moreover, in his own words, Mr. Days appeared before the Commission "to address the issue of remedies in these areas of police misconduct and brutality." Id. at 138. Why then would he limit himself to "minor" criminal remedies if such a titanic civil suit as this one was possible? Indeed, if Mr. Days thought for any reason that the Attorney General was authorized to bring this action, regardless of what the source of that authority might be, I cannot believe that he would have failed so to inform the Civil Rights Commission.[16]

For all the reasons expressed above, I conclude that the Attorney General has no implied authority to maintain this lawsuit and obtain the broad relief that he seeks.

## IV. INHERENT POWER OF THE EXECUTIVE BRANCH

■ As a final alternative to his arguments based on express and implied statutory authority, the Attorney General also submits that authorization for the bringing of this lawsuit can be found in the inherent power of the federal government's executive branch. The plaintiff has constructed three theories to support this argument.

Initially, the Attorney General relies on the Supreme Court's recent decision in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). There, the Court held that a cause of action existed directly under the Fifth Amendment where plaintiff had been discriminated against in her employment because of her gender, and no federal statute authorized suit against

---

16. Curiously, Mr. Days was one of the attorneys who signed the complaint in this case.

her employer.[17] The Attorney General cites *Davis* for the proposition that the courts should imply a cause of action under the Constitution wherever Congress has not provided adequately for the protection of constitutional rights. The plaintiff then goes on to argue that I should imply such a cause of action here, *in favor of the federal government,* because "there is no other adequate remedy" for the wrongs alleged in the complaint.

There are two defects in plaintiff's argument. First, as I held in Part III, supra, it is incorrect to say that there are no other adequate remedies for widespread, systematic abuse of civil rights by a police department, such as this complaint alleges. Both individual and class actions are available under the civil rights laws, particularly 42 U.S.C. § 1983, by which the relief sought here can be obtained. See Part III, supra. This case is thus fully distinguishable from *Davis v. Passman,* supra, where no statutory action existed by which the plaintiff could redress the wrong she had suffered.

Second, even if it were true that no other adequate remedy existed, I would still not recognize an implied cause of action for *this plaintiff.* The Attorney General does not allege any injury to himself or to the United States government. Rather, this lawsuit seeks redress for alleged injuries to third persons who are not parties, and whose interests are not presently represented before this court. *Davis v. Passman* does not authorize such vicarious litigation. On the contrary, the *Davis* Court recognized an implied right of action only on behalf of "the class of those litigants who allege that their *own* constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights." 442 U.S. at 242, 99 S.Ct. at 2275 (emphasis added). The cases relied upon by the Court in reaching this conclusion similarly involved plaintiffs who sought relief from injuries to their own rights and interests. See *Bivens v. Six*

*Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (plaintiff was arrested and searched without probable cause); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (class action plaintiffs were denied admission to public schools because of their race); *Jacobs v. United States,* 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933) (plaintiff landowner alleged that his property had been taken without just compensation). Thus, if no statutory remedy existed, I might well be inclined to apply *Davis v. Passman* and find an implied right to sue in an individual or class action brought by the victims of the brutality alleged in this case. This is very different from implying the same right to sue on the part of an executive official who alleges injury neither to himself nor to the government he is sworn to represent.

█ Next, the Attorney General argues that he has inherent authority to prosecute civil actions which seek to further the important interests of the United States. He submits that several important federal interests are at stake in this case, including the removal of burdens on interstate commerce, as well as the protection of federally guaranteed constitutional and statutory rights.

Considerable reliance is placed here by the plaintiff upon the landmark decision of *In re Debs,* 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). *Debs* involved the famous Pullman strike which threatened to cripple Chicago's railroad system in 1894. The petitioners were officers of the American Railway Union. During a dispute with the Pullman Palace Car Company, the union effectuated a boycott of the company's cars by preventing various railroads from running their trains into or out of Chicago. Under the leadership of Debs and his confederates, union members derailed trains, locked switches, removed spikes and rails, and assaulted employees of the railroad companies. Of particular concern to the

---

**17.** At the time relevant to the suit, the plaintiff's employer was a member of the United States House of Representatives.

government was the fact that Chicago served as a central clearinghouse for many food products, especially meat. Petitioners' actions against the railroads threatened to disrupt this entire food distribution system. *In re Debs,* supra, 158 U.S. at 565–70, 15 S.Ct. 900. So serious was the situation that Debs and the other union leaders were charged with the intention "by the said conspiracy and combination, to secure unto themselves the entire control of the interstate, industrial, and commercial business in which the population of the city of Chicago and of the other communities along the lines of road of said railways are engaged with each other." Id. at 567, 15 S.Ct. at 901.

On application of the federal government, an injunction was issued against the disruptive acts of the union members. When Debs and several others violated the injunction, the government filed a complaint. After a hearing, the defendants were found guilty of contempt, whereupon they were sentenced to imprisonment. On their petitions for writs of habeas corpus, the Supreme Court considered whether the Attorney General was authorized to seek the injunction.

The Court found first that the injunction was justified by the government's proprietary interest in the mails. By no means, however, was the opinion limited to this narrow holding:

> We do not care to place our decision upon this ground alone. Every government, entrusted by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of

itself sufficient to give it a standing in court.

158 U.S. at 584, 15 S.Ct. at 906.

Thus, the Supreme Court held that in the circumstances before it, the Attorney General had the power to seek equitable relief from the federal courts, despite the absence of express statutory authority. Most significantly, the above quoted language makes it clear that this power to sue is not limited to the cases where the government has a monetary interest at stake. Rather, the Attorney General could seek relief where necessary "to promote the interest of all, and to prevent the wrongdoing of one, resulting in injury to the general welfare."

The plaintiff before me advances the celebrated *Debs* decision as support for his authority to bring this lawsuit. The governmental interest relied upon in *Debs* was the right to act against an obstruction to interstate commerce, as well as the threat to the public welfare that this obstruction posed. In the present case, the Attorney General argues that the defendants' abusive practices have placed a burden on interstate commerce because persons travelling to Philadelphia from other states are subjected to police misconduct. Thus, the plaintiff argues that he has the authority to remove this obstruction on interstate commerce by bringing the present suit for an injunction.

In support of plaintiff's position is the opinion in *United States v. Brand Jewelers, Inc.,* 318 F.Supp. 1293 (S.D.N.Y.1970). There, the government challenged the fraudulent practices of a retail jewelry dealer. Defendant sold merchandise to poor persons on credit. Upon default by the buyer, defendant would arrange for false verification of process service, followed by default judgment and eventual wage garnishment, all without effective prior notice to the buyer. Alleging that this practice was widespread, the Attorney General sought an injunction. Relying on *Debs,* the court sustained plaintiff's right to bring the action and secure the requested relief. The court noted the allegation that the defendant's practices imposed a substantial burden on interstate commerce.

This was enough to warrant application of *Debs*. 318 F.Supp. at 1298–99.

With all due respect to my colleague in the Southern District of New York, I must decline to follow the *Brand Jewelers* rationale. Similarly, I must reject the argument that the plaintiff has standing to bring this action because of an alleged obstruction to interstate commerce. In my view, this argument expands the *Debs* precedent far beyond the horizons that it was meant to reach.

*Brand Jewelers* has been broadly criticized by courts and commentators alike as a severe misreading of *Debs*. *United States v. Solomon*, 419 F.Supp. 358, 368 (D.Md. 1976), aff'd, 563 F.2d 1121, 1128 (4th Cir. 1977); 37 Brooklyn L.Rev. 426 (1971); 84 Harv.L.Rev. 1930 (1971). First, *Debs* presented an extraordinary factual situation. The petitioners there were posing a violent physical obstacle to the flow of interstate commerce and their actions were a clear menace to the public welfare. Moreover, the situation was not one that developed gradually over a long period. Rather, the impact of this strike was immediate, creating an emergency environment where time was of the essence. It is clear that this was a factor in the Court's decision. "The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws." See 84 Harv.L.Rev. 1930, 1936. By contrast, no such immediate threat exists in this case, nor was it presented by the facts of *Brand Jewelers*.

Secondly, a more fundamental reason exists for giving *Debs* a narrower interpretation than that urged upon me today. The interstate commerce aspect of this case is at best a remote and secondary factor. The charge here is that the Philadelphia police department has visited acts of brutality upon the population at large and upon minorities in particular. Almost as an afterthought, plaintiff further alleges, in a single paragraph of the complaint, that persons engaged in interstate commerce and interstate travel have been among the victims of this brutality. See Complaint ¶ 46. Plaintiff does not even suggest, however, that there is any significance to the interstate character of this commerce or travel, nor does he attempt to connect it in any way with the brutality alleged. Rather, all the Attorney General charges is that certain persons, who happened to be engaged in interstate commerce or travel, were among those subjected to acts of police abuse.

 Of course, even this happenstance, if true, would no doubt support the authority of *Congress* to enact corrective legislation. It is quite another matter, however, to say that such a coincidental circumstance authorizes the Attorney General to bring a civil action seeking massive injunctive relief without the consent of Congress. It should be remembered that the Constitution does not vest the commerce power in the federal government generally. Rather, this vast power is vested in Congress alone. U.S.Const. Art. I, § 8. In my view, therefore, the Attorney General can not be deemed authorized to bring civil injunctive suits every time he is able to show some involvement of interstate commerce, no matter how remote or irrelevant that involvement may be. Rather, I hold that in the absence of extraordinary circumstances, such as those present in *Debs,* it is the sole province of Congress to decide how the commerce power is to be exercised. Thus, in most circumstances, civil injunctive suits brought by the Attorney General should be allowed only where they are authorized by an express statutory enactment. Any other approach would permit the executive branch to usurp the function of Congress, thereby doing great violence to the separation of powers doctrine.[18]

---

**18.** The plaintiff also argues that he has inherent authority to bring this lawsuit because of the federal government's interest in protecting rights guaranteed by the Fourteenth Amendment and in preventing the expenditure of fed-

See Note, *Nonstatutory Executive Authority to Bring Suit,* 85 Harv.L.Rev. 1566, 1573–74 (1972).

██ The final argument advanced by the plaintiff in support of his claim to inherent authority for the bringing of this lawsuit is the theory that the United States has standing to sue as *parens patriae* where the health, safety and welfare of its citizens is threatened. See generally *Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 257–58, 92 S.Ct. 885, 888–89, 31 L.Ed.2d 184 (1972). To support this position, however, the plaintiff relies once again on the premise that "suits by individuals would be inadequate to remedy the harm" alleged in this complaint. Cf. *Missouri v. Illinois and the Sanitary District of Chicago,* 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497 (1900). I have already expressed my reasons for rejecting this premise. Individual and class suits brought under the civil rights laws are not "inadequate." On the contrary, such suits are a fully available remedy by which proper plaintiffs can secure the very relief sought in this case. See Part III, supra. This remedy is not rendered any less "adequate" merely because the requirements for success in such a lawsuit are stringent. If these requirements impose excessive burdens on civil rights plaintiffs, mitigating changes can be effected by Congressional enactment or judicial interpretation. It is quite possible, however, that no such changes are warranted. On the contrary, it may well be that both Congress and the courts will continue to impose strict standards of pleading and proof before sanctioning the type of relief sought here. In the absence of controlling authority to the contrary, such standards will always be adhered to by this court.

Furthermore, even if individual suits were inadequate, I could not accept plaintiff's theory. It is argued here that the federal government should be permitted to seek relief from the courts whenever the civil rights of its citizens have been violated. Such a power is no different than the much-vilified authority to sue directly for enforcement of all constitutional rights. The arguments against placing such a fantastic power in the hands of an executive official have already been discussed and need not be restated. Suffice it to say now that such a power would be as ill-advised as it would be unrestricted.

Thus, for all the reasons expressed in Parts II, III, and IV, supra, I am firmly convinced that the Attorney General of the United States has neither the express, nor the implied, nor the inherent authority to maintain this lawsuit.

## V. POTENTIAL ABUSE OF POWER

██ In the preceding sections, I have discussed the reasons why I believe that the Attorney General lacks the authority to bring this suit. In addition to stating why I am convinced that he does not have this power, I think it appropriate to add the reasons why, in my view, such power should not exist.

First, to permit the Attorney General to bring this type of suit would run counter to well-established principles of standing law developed in other contexts. In *United States v. Mattson,* supra, the Court of Appeals for the Ninth Circuit recognized that like other litigants, the Attorney General is subject to the familiar requirement of an " 'injury in fact' " to an interest which is " 'arguably within the zone of interests to

---

eral funds in a manner that violates the constitution.

Of course, this entire opinion would be pointless if I were now to conclude that the Attorney General possesses the inherent power to sue for enforcement of all Fourteenth Amendment rights. This would be the most extreme exponent possible of the same power that Congress rejected in defeating Title III. If he could employ enough lawyers to do his bidding, such a power would permit the Attorney General to

impose himself upon every conceivable phase of state and local government, thereby exploding the federal system. I hold firmly that no such power exists.

I have already held that I will retain jurisdiction of this case to the extent that it involves allegations of racial discrimination in the administration of federally funded programs and the expenditure of federal funds. See Part II, supra. Further comment on this subject is unnecessary.

be protected or regulated by the statute or constitutional guarantee in question.' " 600 F.2d at 1300, quoting *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Of course, the constitutional amendments and civil rights statutes relied upon in this complaint were meant to protect neither the United States government nor its Attorney General. Rather, these noble laws seek to protect individual citizens, who, not surprisingly, are the only ones alleged to have suffered any injury. Such individual citizens, therefore, are the only plaintiffs that I could recognize in this lawsuit. As the *Mattson* court stated, any other holding "would require a court to rule on important constitutional issues in the abstract, and allow a potential abuse of the judicial process." 600 F.2d at 1300.

 Secondly, it is clear that to recognize standing in this case would be to vest an excessive and dangerous degree of power in the hands of the Attorney General. This was the fear that defeated Title III two decades ago, and it is a fear that remains valid today. The point is that the power which the Attorney General claims in this case is simply not compatible with the federal system of government envisioned by the Constitution. This power, in essence, would permit the Justice Department to bring a civil suit against any state or local administrative body merely because the Attorney General and his subordinates have determined that the defendant's operating policies and procedures violate any one of the civil rights guaranteed to citizens by the Constitution and laws of the United States. The purpose of such a lawsuit would be to obtain an injunction altering the challenged procedures. Quite literally, there would be no end to the local and state agencies, bureaus, offices, departments, or divisions whose day-to-day operating procedures could be challenged by suit, and changed by injunction.

It is well to remember that this case does not present an attack on brutality, *per se.* Rather, the challenge here is to policies, practices and procedures of the police department that are said to violate constitutional rights because they *foster* brutality. The conceivable variations on this lawsuit are practically infinite. Suppose, for example, that a municipal transit authority decides to reduce bus service by 50 percent in a particular neighborhood. The Attorney General could sue the transit authority, seeking an injunction against the new policy on the ground that since the rest of the city's bus service has not been reduced, the policy violates the equal protection rights of the people in the affected neighborhood. The same result could occur if the sanitation department reduced trash collections in a certain area, or if a fire department closed a particular local firehouse. These policies, too, could be challenged by a suit for an injunction. Suppose a county dog pound had a policy of destroying strays after forty-eight hours without any attempt to locate the owner. Here, too, the Attorney General could seek an injunction because the policy violates the owner's due process right to notice and a hearing before being deprived of his property. Perhaps the public library has too few books on African history; the municipal hospital adopts excessively restrictive visiting hours; the state health department decides to require polio immunizations for all children under the age of five; the county coroner conducts a full autopsy and inquest in all cases of violent death. In each instance, the Attorney General comes to the rescue with a civil suit for an injunction, seeking to alter the offending policy.[19]

I do not doubt that every one of the above hypotheticals could constitute an actual infringement on civil rights, and might present an appropriate case for injunctive relief in a suit brought by an injured party. It is quite another matter, however, to say that the Attorney General of the United States should be authorized to seek such relief. Perhaps it will be suggested that the above hypotheticals exaggerate the sweep of this power and that they do not fall into the same realm as the present suit.

___

19. See also the hypothetical of Senator Talmadge, discussed in note 4, supra.

The frightening fact is, however, that I have not exaggerated the problem at all. If the Attorney General can sue the police department for maintaining policies that violate civil rights, there is nothing to prevent him from bringing similar suits to "correct" the offending policies of the transit authority, the sanitation department, the public library and the dog pound. Indeed, one would no doubt be hard pressed to find an agency, office, or administration at any level of state or local government that did not maintain at least one policy which could arguably be said to violate a right secured by the federal constitution. Commanding legions of "lawyer-bureaucrats,"[20] the Attorney General could sweep across the nation, thrusting himself into the policy-making machinery at every level of government from the village hall to the governor's mansion.

It should be further noted that, taken to its logical extreme, the theory advanced by the Attorney General would extend his power even beyond the boundaries of the civil rights laws. The plaintiff has tried to persuade me that the Department of Justice is authorized to bring any lawsuit that serves the "interests" of the United States or the health, safety and welfare of its people. There is no conceivable limit to such a power. Consider, for example, the speed of motor vehicles. Excessive speeding wastes fuel, thereby harming the national interest. It also jeopardizes lives, thus posing a hazard to the health and safety of citizens. To meet this dual threat, Congress has established a "national maximum speed limit" of 55 miles per hour. 23 U.S.C. § 154. Suppose, however, that the Attorney General, or one of his assistants, decided that this limit was inadequate to protect the national interest or the health and safety of the people. Could he then actually bring a lawsuit to establish, by injunction, a *lower* national speed limit than that which Congress enacted? Under the plaintiff's theory, this hypothesis is not at all far-fetched. He has argued vigorous-

ly that the mechanisms enacted by Congress for protecting civil rights are inadequate to do the job, and that he is therefore authorized to improve upon these mechanisms by seeking injunctions in the federal courts.

■ While pondering all this, it is important to remember that the Attorney General and his subordinates are not elected officials. They are not subject to the sobering influence of the ballot box, and they never need to worry about the whim or desire of any electorate. Yet they stand before this court today and claim the power to decide what will serve the nation's "interest" and the people's "welfare." I am persuaded that such a power was never intended to lie in the hands of an executive appointee. Rather, I hold that these decisions are best made by Congress alone.

■ In *United States v. Brand Jewelers*, supra, it was suggested that the power of the court will be an effective check on any possible abuse of power by the Attorney General. 318 F.Supp. at 1299. I do not agree. Law suits of this nature can have devastating effects without ever being adjudicated by any court. The very threat of the suit could alter the conduct of local policy-makers. Once the suit is begun, capitulation and settlement may be the only choice for the local official facing the awesome resources at the Attorney General's disposal. Accord, *United States v. Solomon*, supra, 419 F.Supp. at 366; Note, *Non-Statutory Executive Authority To Bring Suit*, 85 Harv.L.Rev. 1566, 1574 (1972).

It is clear to me, therefore, that the authority to bring· a lawsuit of this kind should never be vested in the Attorney General. This conclusion is fully in accord with the decisions of the Courts of Appeals for the Fourth and Ninth Circuits in *Mattson* and *Solomon*, supra.

I recognize, of course, that this is a much broader case than either *Mattson* or *Solomon*. The Attorney General has argued

---

**20.** *United States v. Solomon*, 419 F.Supp. 358, 366 (D.Md.1976), aff'd, 563 F.2d 1121 (4th Cir. 1977).

that the great power he seeks is more necessary and appropriate in this case because we are concerned here with a more widespread deprivation of rights. See *United States v. Mattson*, supra, 600 F.2d at 1298 n. 3. I do not agree. First, this argument seems almost to recall the *Debs* rationale, where a crisis situation posed a threat to the safety and welfare of many people. I have already held that this rationale is inapplicable here. See Part IV, supra.

Second, the alleged "victims" in this case presumably are better able to represent themselves than were the mentally retarded persons in *Solomon* and *Mattson*. Yet, the Attorney General's attempts at vicarious litigation were turned away in both those cases.

Finally, the large scale of this case involves more than an allegation of widespread infringement on civil rights. It also entails a prayer for mammoth equitable relief. If successful, this suit would have a tremendous impact on the operation of the entire police department, thereby producing a far more pervasive intrusion on local authority than anything which might have resulted from *Mattson* or *Solomon*. In this very real sense, then, the sound principles of federalism relied upon by the Fourth and Ninth Circuits apply with even greater force here.[21]

■ It may be that some civil rights violations cannot be effectively redressed by the victim. If so, Congress may find it appropriate to enact legislation permitting the Attorney General to bring suit. Hopefully, any such legislation would carefully limit its grant of power, specifying the rights that may be enforced and defining the circumstances in which suit may be brought. Of course, it may even be that Congress will one day disregard the concerns that defeated Title III, and grant to the Attorney General an unlimited power to sue for the enforcement of the civil rights laws. Whether I would agree with such action is not important. The point is that it lies within the province of Congress *alone* to decide when, where, and to what extent the Attorney General should be empowered to bring lawsuits of this nature. At the present time, this power does not exist. The complaint must therefore be dismissed.

## VI. ABUSE OF POWER IN THIS LAWSUIT

■ In the preceding sections, I have discussed the reasons why I believe that the power to maintain this lawsuit does not and should not rest with the Attorney General of the United States. The ways in which such a power might be abused have been demonstrated at length. Nevertheless, one more example of this abuse should be examined. Indeed, this example warrants special consideration, because it is to be found in the very facts and circumstances of the present lawsuit.

The complaint in this case was filed on August 13, 1979. As discussed earlier, it charges the individual defendants, including Mayor Rizzo and Police Commissioner O'Neill, with personal wrongdoing in devising and perpetuating policies which result in police brutality. Since November of 1978, however, it has been well-known that the present administration will leave office on January 6, 1980.[22]

---

**21.** This is not the first time that the Attorney General has unsuccessfully claimed standing to sue where civil rights have allegedly been violated on a large scale. In *United States v. Elrod*, No. 76 C 4768 (N.D.Ill. May 16, 1978), the Attorney General sought injunctive relief against "systemic and wide-spread deprivation of Eighth and Fourteenth Amendment rights occurring within the facilities of the Cook County Department of Corrections." Id. slip op. at 1. Relying on the decisions of the district court and the court of appeals in *United States v. Solomon*, supra, the court held that

the plaintiff lacked standing to maintain the suit. Id. at 5. In so holding, the court made the interesting observation that the Attorney General "has been bringing Eighth and Fourteenth Amendment suits throughout the country in an attempt to find a district court which would hold that it had standing to do so." Id. at 13.

**22.** In November of 1978, the voters of Philadelphia defeated a referendum that would have permitted Mayor Rizzo to run for a third term.

From its inception, this lawsuit has been attended by a carefully cultivated public image. Repeatedly, plaintiff's counsel made sensational public statements which created the clear impression that the investigation was completed, the evidence was all in, and the defendants' guilt had been established beyond doubt. Thus, the public has been enlightened with the knowledge that "[t]he suit is the result of an eight month investigation," and that "months of investigation were needed to gather evidence." [23] With plaintiff's senior counsel cited as the source, it has been reported that plaintiff's "attorneys combed the files of the police department," and are "prepared to produce evidence supporting the allegations." [24] As early as August 14, 1979, the Deputy Attorney General in charge of the Civil Rights Division of the Justice Department was quoted as saying: "We have found widespread abuse of federal law and that's why we are bringing this lawsuit . . .. We think we have *ample evidence* of intimidation of people by Philadelphia policemen and the coverup of this intimidation by their superiors." [25] Similarly, this same official stated that "we have a well-thought-out and well-documented lawsuit." [26] The public was further told that "[t]o underline the importance of the suit, Attorney General Griffin B. Bell personally signed the complaint Friday in one of his last major acts before retiring. An attorney general rarely signs individual complaints." [27] Not to be left out is the present Attorney General, Benjamin R. Civiletti, who said that "the Justice Department had been careful in preparing its police abuse suit against Philadelphia officials." He went on to describe the case as a "rather simple suit to obtain systemic relief from the top down in the [police] department." [28] In a summary of his remarks at a press conference, Mr. Civiletti was said to have stated flatly that "some officers on the city's police force repeatedly violate the civil rights of individuals, but that the city has done very little to remedy the situation. Police officers are seldom given adequate training or subjected to proper discipline for their abuses he said. There has been a near 'total failure' to deal effectively with allegations of brutality, the Attorney General stressed." 26 Crim.L.Rep. 2065 (BNA) (October 17, 1979).

Thus, the Justice Department adopted a public posture of complete readiness to prove what it had alleged. The government's counsel publicly treated their charges as established facts, and created a distinct impression that the necessary supporting evidence was already prepared. Eight days after the complaint was filed, however, I met with counsel and suggested a pre-trial schedule which would have brought this matter to trial on October 15. I was immediately told by government counsel that my schedule was not reasonable, that no testimony under oath had been taken, that no documents had been copied, and that an unknown number of witnesses would have to be located, interviewed, and prepared for court.[29] These protests were raised despite the much-heralded "eight month investigation" and the "ample evidence" it had produced. Since the government objected so vigorously to the timetable I had announced, I asked each side to submit a proposed pre-trial schedule. The plaintiff's response stated that the earliest possible date by which it could complete discovery was December 9, 1979. This date, of course was only an optimum deadline, and it did not allow for delays of any type or duration. Moreover, the schedule was qualified by the statement that "[p]laintiff

**23.** The Philadelphia Inquirer, August 14, 1979, at 6–A, col. 3–4.

**24.** The Philadelphia Inquirer, August 14, 1979, at 6–A, col. 4.

**25.** The Bulletin (Philadelphia), August 14, 1979, at 7a, col. 1 (emphasis added).

**26.** Philadelphia Daily News, August 14, 1979, at 17, col. 3.

**27.** N.Y. Times, August 13, 1979, p. A 1.

**28.** The Bulletin (Philadelphia), August 20, 1979, at 7a, col. 4.

**29.** *See Pre-Trial Conference No. 1, Tr. at 16, 18.*

anticipates further discovery will be necessary concerning the actions of individual officers." Thereafter, the plaintiff vigorously opposed a motion by defendants to expedite discovery and list the case for trial before November 20, 1979. The stated ground for this opposition was that a November trial date would still not give the plaintiff enough time to satisfy its discovery needs.

It is quite clear, therefore, that at the same time the plaintiff's lawyers were making their pitches to the press, they knew they would be unprepared to bring the case to trial while the Rizzo administration remained in office. In other words, it was the plaintiff's plan *from the beginning* that the principal, individual defendants would never be afforded the opportunity to defend themselves in the courtroom against the serious charges made in the complaint. The obvious injustice of this situation neither stayed the lawsuit nor tempered the outpourings to the media.

Indeed, plaintiff's counsel have steadfastly maintained that the impending change in city administration is of no significance to this case at all. Repeatedly, plaintiff has offered the cavalier suggestion that when the new mayor and his associates take office,[30] they can simply be substituted for the present defendants "as provided in the Federal Rules of Civil Procedure." Plaintiff's Memorandum in Opposition to Defendant's Motion to Set Trial Date, at 2. See also Pre-Trial Conference No. 1, Tr. at 21; United States Memorandum Concerning Standing, Mootness, and the Proposed Future Course of this Litigation, at 38. The plaintiff refers here to Fed.R.Civ.P. 25(d)(1) which provides in relevant part that "[w]hen a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party." Plaintiff has made much of its "deliberate decision to name no one in their personal capacity." Rather, each of the individual defendants "are named only in their official capacity." Pre-Trial Conference No. 1, Tr. at 21. Thus, as plaintiff sees it, the substitution procedure of Rule 25 can be invoked in this case as a matter of mere routine.

It is not difficult to see why plaintiff's position disturbs the defendants. By its terms, Rule 25(d)(1) appears applicable in the technical sense, as Mayor Rizzo will obviously be succeeded in office. Nevertheless, it is clear that neither the Mayor, nor the Commissioner, nor any of their subordinates, are named in this case as nominal defendants. Rather, this complaint charges, as indeed it must, that they are *personally* responsible for initiating and carrying out policies which are calculated to brutalize the population of Philadelphia.[31] Yet, these people will never have an opportunity to defend themselves against the complaint's accusations if new defendants are substituted when the Rizzo administration leaves office. Thus, while Frank Rizzo and Joseph O'Neill are charged with willfully orchestrating a campaign of brutality and lawlessness, the government's timing precludes Rizzo and O'Neill from presenting a defense. The government's deliberate plan was that by the time the case was

---

**30.** Some of the police department officials who were named as defendants in this case are protected by the civil service status of their positions and cannot be replaced simply because a new administration comes to power. This protection, however, does not extend to Commissioner O'Neill, nor does it apply to defendants Harry G. Fox and Morton B. Solomon, both of whom are Deputy Police Commissioners. All three mayoral candidates have said that they will appoint a new Commissioner, who in turn would have the power to name new Deputy Commissioners.

**31.** Among other things, the individual defendants are charged with illegal practices which are arbitrary, unreasonable, and "shocking to the conscience." It is alleged that they acquiesce in and condone cover-ups, physical abuse, inadequate investigations, and the use of excessive force which results in death or serious bodily injury. Mayor Rizzo is charged with having actually initiated and perpetuated many of the practices which plaintiff seeks to enjoin. By no means, therefore, is this a case where individual city officials are charged merely with failing to prevent police brutality.

ready for trial, the principal defendants, the present mayor and police commissioner, would have been removed from the suit, and their successors in office would have been substituted in their place. While the new mayor might be capable of defending the City of Philadelphia, he would have no interest in clearing Frank Rizzo's name. Similarly, the new police commissioner would not be likely to champion the personal interests of Joseph O'Neill. Obviously, there would also be a change of counsel when the new defendants are substituted, thus further ensuring that those accused of wrongdoing would have no representation at the time of trial.[32] In fact, it does not take much imagination to realize that it might well serve the political interests of the new administration to simply blame everything on its predecessors. It is entirely possible that the new mayor and his appointees would have no reason to proceed with the trial at all. The obvious course for them would be to settle this case, agreeing to change certain operating procedures in the police department and publicly accepting the principle that police brutality is wrong.[33] The new mayor could thereby share the credit for ending the systematic police abuse which the Justice Department says exists. At the same time, the Justice Department would have avoided the responsibility of proving that this abuse existed at all.[34]

To put it bluntly, the government's timetable, in combination with its press releases, amounted to a stacked deck, the effect of which was to deny the individual defendants their day in court. Certainly, I do not question the plaintiff's right to engage in pre-trial discovery. The Federal Rules of Civil Procedure do not discriminate against the Justice Department in securing that right. At the same time, I do not deny plaintiff's lawyers the right to talk to the press. The media has an important duty to inform the people, and it is incumbent upon government officials to cooperate in the discharge of that duty. Nevertheless, the combination of these two rights in this case illustrates how power may be misused. The Justice Department attorneys publicly vilified the individual defendants, accusing them of outrageous, conscience-shocking misconduct, while simultaneously planning a schedule for the lawsuit that would prevent these same defendants from ever answering the charges. Through some of its highest ranking officials, the Justice Department created the public impression that the defendants' guilt was already documented and established. Yet, when the individual defendants demanded a speedy trial, as the only means by which they would have the chance to prove their innocence, the government objected on the ground that it needed a minimum of three to four months to discover evidence and prepare its case.

Whether the motivation here was righteous indignation or something less noble is not important. Suffice it to say that what occurred in this case is a most regrettable example of the abuse that might result if the Attorney General were empowered to bring lawsuits of this kind.

---

**32.** It seems doubtful that Rizzo and O'Neill could intervene as individuals after they leave office. As noted earlier, the government was careful to sue the individual defendants only in their official capacities. After they leave office, they will have no official capacity.

**33.** The likelihood of settlement has already been suggested by at least one major mayoral candidate, as well as by plaintiff's counsel. The Review (Roxborough), October 25, 1979, at 1; Philadelphia Daily News, August 14, 1979, at 17, col. 3. See also Philadelphia Inquirer, August 14, 1979, at 6–A, col. 2; id. August 19, 1979, at 1–E, col. 6; Time, August 27, 1979, at 21, col. 2.

**34.** In any event, the substitution of defendants might have prevented the case from proceeding any further for legal reasons. The case could well have been rendered moot unless there was "some indication that the successor would . . . continue the unconstitutional practices alleged in the complaint." *Sarteschi v. Burlein*, 508 F.2d 110, 114 (3d Cir. 1975); See also *Spomer v. Littleton*, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974); *Hirsch v. Green*, 382 F.Supp. 187 (D.Md.1974). This issue, of course, cannot be addressed at the present time since Mayor Rizzo's successor has not yet been chosen.

## VII. CONCLUSION

For the reasons expressed at length above, I shall dismiss this complaint in its entirety, except for the limitation discussed in Part II, supra.[35]

**35.** On October 17, 1979, I received a letter from plaintiff's counsel requesting oral argument on the standing issue. This occurred more than a month after briefs on standing were submitted by counsel for all parties. If the request for oral argument had been made at or about the time that the briefs were filed, I most certainly would have granted it. By October 17, however, I had considered counsels' briefs at great length and had done a great deal of research of my own. In fact, at the time plaintiff's request arrived, the first draft of this opinion was virtually completed. Obviously, therefore, oral argument would have been pointless, unless counsel intended to offer some information or point of law that had not been previously raised. Since no representation to this effect was made, I declined the request for argument.